F5j4spa1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

THE LAW OFFICES OF SPAR &
BERNSTEIN, P.C.,

                    Plaintiff,

          v.                              15 CV 1289(WHP)


ADAM S. HANDLER,

                    Defendant.

------------------------------x
                                    New York, N.Y.
                                    May 19, 2015
                                    2:15 p.m.

Before:

                  HON. WILLIAM H. PAULEY III,

                                        District Judge

                         APPEARANCES

KAUFMAN & COMPANY PLLC
     Attorneys for Plaintiff
BY:  EUGENE R. SCHEIMAN
     STEVEN S. KAUFMAN
     CHRISTIANE McKNIGHT

LAW OFFICE OF JAMES T. SCALISE
     Attorneys for Defendant
BY:  JAMES T. SCALISE

1          (In open court; case called)

2          THE DEPUTY CLERK:  Please state your appearances for

3     the record.

4          MR. KAUFMAN:  Steve Kaufman, your Honor, Kaufman &

5     Company, for the plaintiff.

6          MR. SCHEIMAN:  Eugene Scheiman, your Honor, for

7     Kaufman & Company, plaintiff.

8          MR. SCALISE:  James C. Scalise for the defendant, Adam

9     Handler.

10         THE COURT:  All right.  This is a hearing for a

11    preliminary injunction.  I think the best place to start is for

12    counsel to tell me precisely what issues are going to be tried.

13         MR. KAUFMAN:  May I stand?

14         THE COURT:  You may.  Take the podium.

15         MR. KAUFMAN:  Thank you very much.

16         It is rare that I actually have prepared the beginning

17    of my remarks to be exactly your question, but that is what I

18    did.

19         The parties have reached an agreement, and I believe

20    we made you aware of the contents, so that there is an

21    understanding in writing between the parties that the defendant

22    will not initiate any further solicitation of any of the Spar &

23    Bernstein clients; that he will refrain from making any of the

24    agreed specific statements that we have enumerated in that

25    agreement.  Obviously, there is mutuality on no disparaging

1    remarks by one party against the other.  We have agreed that if

2    there is a violation of any of those terms, the party who

3    believes they have been injured by that violation has the

4    ability to file for an order, basically institute an order

5    restraining whatever it is they're complaining about until the

6    other side has a chance to address it to the court.  So that is

7    our understanding.

8          What remains are two issues:  The personal injury

9    inventory document, according to the defendant, is not a trade

10   secret or confidential.  So that issue is going to be tried,

11   and the plaintiff will put on its evidence and meet its burden

12   to demonstrate that it is protectable and that the Court should

13   issue an injunction preventing the use of the information

14   contained in that document.  The issue can arise in the future

15   in certain instances -- I can address specifics -- in light of

16   the agreement on no solicitation, it is narrower than a broad

17   opportunity for violation of that right that we have, but there

18   are instances where it could occur, and that's why we're

19   seeking the injunction.

20         The second area, your Honor, is that the defendant is

21   contesting that it is in possession of any confidential

22   material deemed confidential by Spar & Bernstein, and pursuant

23   to the confidentiality agreement, Spar & Bernstein has the

24   right -- really the party that has it has an obligation, upon

25   termination, to turn it back to Spar & Bernstein.  Spar &

1    Bernstein has the right to retrieve it and has sought an order

2    of the Court awarding -- or issuing an injunction to

3    mandatorily require the defendant to turn over all this

4    information that it has, and we will show there is an abundant

5    amount of it that they're in possession of.  In this case, if

6    we could have reached an agreement that all of that material be

7    returned, we wouldn't have an issue there, in electronic form.

8    The second is, if there was agreement that there would be no

9    further use of the information contained in the document, then

10    we would not be here today.  But those two issues are being

11    contested by the defense, and we're here to seek the injunction

12    as a result of that.

13            THE COURT:  Mr. Scalise, is that your understanding of

14    the issues that are to be presented?

15            MR. SCALISE:  Yes, it is, your Honor.

16            THE COURT:  Then, let's proceed.  Are you prepared to

17    call your first witness?

18            MR. KAUFMAN:  Yes, your Honor.  There are two quick

19    preliminary matters.

20            THE COURT:  Sure.

21            MR. KAUFMAN:  One, exhibits.  We have prepared a

22    series of binders.  We would have one for the Court, one for

23    the Court's clerk, and put binders up at the witness stand.

24            THE COURT:  That's fine.

25            MR. KAUFMAN:  If we could do that.  There are two

1    binders.

2            THE COURT:  What's the second housekeeping matter?

3            MR. KAUFMAN:  Mr. Scheiman will address it.  To the

4    extent that we get into material that in and of itself might be

5    privileged or confidential, we want to protect it in some way,

6    and Mr. Scheiman is going to address that.

7            THE COURT:  I will hear from you.  How are you going

8    to address it?

9            We are conducting a proceeding in a public courtroom.

10   I don't know who is here and I don't know who might come in.

11           MR. SCHEIMAN:  Your Honor, if I may briefly address

12   that issue.  I believe, with respect to trade secrets, the law

13   is fairly clear in the Southern District, that the Court can

14   order the courtroom closed to non-participants.  We're not

15   trying to exclude the defendant.  But because a trade secret

16   loses its secrecy if it is in a public forum, we would ask the

17   Court, when we get to certain documents, which are very

18   minimal, to exclude anyone from the public.

19           THE COURT:  We will see, but I seriously doubt that

20   I'm going to close the courtroom, all right.  It is contrary to

21   everything that the federal courts stand for.

22           MR. SCHEIMAN:  I am well aware of the openness of the

23   proceedings before a United States District Court, but the

24   Supreme Court itself has said that there are exceptions, and

25   one of those exceptions that has been focused upon is trade

1    secret --

2          THE COURT:  I'm aware of it.  Let's get on with it,

3    and when we get to something that purports to be a trade

4    secret, I will look at it, and I will make a decision.  All

5    right?

6          MR. SCHEIMAN:  Yes, thank you, your Honor.

7          We are prepared to call our first witness.

8          THE COURT:  Okay.

9          MR. SCALISE:  Your Honor, before they call the first

10   witness, I believe we have reached an agreement with respect to

11   exhibits.

12         Is that correct, Mr. Scheiman?

13         MR. SCHEIMAN:  Yes, it is.

14         THE COURT:  Let's just address the Court, okay,

15   Mr. Scalise.

16         MR. SCALISE:  I'm sorry, your Honor.

17         I believe we have reached an agreement with respect to

18   the admissibility of exhibits, to assist the court in getting

19   them into evidence.

20         THE COURT:  Just to be clear, whether you have an

21   agreement or not, you're going to offer an exhibit

22   individually, and your adversary will either express an

23   objection or no objection, and then it will be received.  We're

24   not going to dump two loose-leaf binders into evidence without

25   having any witness opining or describing them.  All right?  So

F5j4spa1

1    documents won't be coming into evidence unless somebody is

2    going to explain them.

3        MR. KAUFMAN:  That was my last point.  Would you like

4    us to wait until the conclusion of the evidence in our case to

5    present which exhibits you would like us to introduce into

6    evidence?

7        THE COURT:  No.  Introduce them as they're being

8    discussed.

9        Anything else?

10        MR. KAUFMAN:  I have a brief opening, if the Court

11    wishes.

12        THE COURT:  If you want to make a very brief opening,

13    you can proceed, or we can move right to the testimony.

14        MR. KAUFMAN:  I will try to keep it brief, but it

15    gives the Court, I think, a view of where we're going, which

16    might be useful.

17        THE COURT:  Okay.

18        MR. KAUFMAN:  I will try to move through this quickly,

19    your Honor.  Thank you.

20        The defendant will admit that he possesses a

21    substantial amount of client and firm-related material on his

22    personal email and iPhone accounts that include confidential

23    and privileged information.  He has a substantial, over time,

24    number of devices that he's used, transferring at times data

25    from his firm device to his personal device and then holding

1    them, to this day continuously, on his personal device.  He has

2    failed to return the material that the firm has asked for,

3    which is either client-related material or firm-related

4    material, in violation of firm policies, in violation of a

5    confidentiality agreement that he signed, rules of professional

6    responsibility, and the explicit request of the return of the

7    material; under all of those bases.  There is no legal excuse

8    for that.  We believe that's what the evidence will show.

9    That's why we seek the injunction.

10              The evidence will show that the personal injury

11   inventory document that has been referred to as the trade

12   secret was created, in part, by Mr. Handler; reviewed

13   particularly and regularly by Mr. Handler; edited from time to

14   time by Mr. Handler; worked on by Mr. Handler; revised again at

15   times by Mr. Handler; was the subject of an office meeting for

16   all the personal injury lawyers, where they one-by-one divided

17   the work in the office based upon the personal inventory

18   document; created a grading system and assigned grades to every

19   personal injury case at the firm, based on collaboration

20   between Mr. Handler, the defendant, and Mr. Rossol, and

21   collectively exercising their judgment to arrive at those

22   grades.  All of the work to populate that document and all of

23   the categories of information that you'll hear in the evidence

24   involves substantial effort and cost over approximately a

25   six-month period of time.  The information populates, for over

1    300 cases, all sorts of different categories.

2         Mr. Handler studied this material.  He learned it in

3    detail over time.  It is known to him.  The case grade was

4    based upon analysis.  Mr. Rossol has significant underwriting

5    background and used that expertise to provide his analysis of

6    the grade.  Mr. Rossol had his practice experience and had the

7    opportunity to effect grades as he chose.  It is a trade

8    secret.  It was used only internally at the firm.  It was used

9    for case management, the allocation of resources, the

10   assessment of the strength of its assets in the form of the

11   claims of the clients that it was handling the representation

12   of.

13        We believe, beyond the fact that we can establish it

14   is a trade secret, it was a confidential firm document under

15   the firm's confidentiality agreement and, in and of itself, for

16   that reason should have been returned and not used.

17        Mr. Handler had the document itself in addition to the

18   knowledge I've described.  He had a hard copy of it.  He'll

19   admit that.  He had electronic versions of it in multiple forms

20   over time.  He will admit that.  And he had knowledge of the

21   detail in it based upon his regular significant involvement as

22   I have just described.

23        We believe he has possession of it today.  You will

24   hear evidence that there were in February of 2015, when he

25   arrived at his new law firm, the Pollack firm, had 40,000

1    emails that he had from his Spar & Bernstein service as an

2    associate populate his personal email account.  Those emails

3    are accessible to him today.  They are accessible to him on his

4    desktop at work today.

5            In addition, your Honor -- and I will close with these

6    points -- we believe that we will establish Mr. Handler's

7    knowledge, the way I have just described, his use of the

8    information in the solicitation of clients through a series of

9    facts from which we believe that conclusion can be drawn.  We

10   believe that he targeted, specifically targeted, the high-value

11   cases when he focused his efforts in the days following his

12   termination.  He had a huge financial incentive to do that.  He

13   joined a new firm, and that firm provided him 50 percent of the

14   collections on matters that he would bring to that firm.

15   Mr. Handler admitted he remembers the A-grade cases on some of

16   the cases that he solicited.  He will admit that he synched his

17   firm iPhone to his personal iPhone by setting up a series of

18   apps that he says transferred all of his contacts from his firm

19   iPhone to his personal iPhone, so the moment he left the firm

20   on January 21st, he could access all the phone numbers and

21   names of all his clients, and he started calling them, and he

22   said he called them all, all the calls he said he made in a

23   very short period of time.  At the same time he did that and as

24   those clients started signing documents transferring the

25   matter, those documents would come to the Spar & Bernstein firm

1    with an instruction that they were not any longer to contact

2    the client because the new lawyer was Mr. Handler.  Mr. Handler

3    succeeded through that process of attracting 37 percent of the

4    A-graded cases on the personal injury inventory.  He admits to

5    making -- and we don't know exactly how many he made -- but he

6    admits to making 36 phone calls in a very short period of time.

7    44 percent of the cases that he attracted based on those

8    initial calls were A-graded cases on his inventory, and he had

9    a large inventory beyond those number of cases that were

10   assigned to him.

11          Shortly after he left, a request by the Spar &

12   Bernstein firm that Mr. Handler agree to a joint letter -- this

13   is at the very beginning -- was refused.  So there was no joint

14   letter sent.

15          The client transfers occurred steadily, not just at

16   the beginning, but they were in January, February, March, last

17   one at end of April.  We believe this is an ongoing process.

18          You will hear testimony -- and I won't go into the

19   detail now -- but I don't believe Mr. Handler is fully truthful

20   and candid.  And you will ultimately hear an equivocation on

21   whether he believes he has the right to use this grade

22   information when he is soliciting clients.  And we believe that

23   that equivocation and the way you will hear it demonstrates the

24   threat of its continued use in the future if not enjoined.

25          All we ask for is that he be prevented from using the

1   confidential document and confidential information in it and

2   this part of the matter is concluded.

3           We believe that the public equities and the public

4   interest is best served by the issuance of these two aspects of

5   the injunction, and I can go into the specific relief we're

6   looking for at the end of the hearing, your Honor, but it is

7   pretty focused for purposes of this injunction here.

8           Thank you very much.

9           THE COURT:  Thank you, Mr. Kaufman.

10          Mr. Scalise, would you care to make any opening

11  statement?

12          MR. SCALISE:  Yes, your Honor.  I will be brief.

13          Good afternoon, your Honor.

14          Simply put, plaintiff made a bad business decision in

15  firing the most successful personal injury and productive

16  personal injury attorney in the firm's history.  And its claims

17  of misappropriation of trade secret or improper use of

18  confidential and proprietary information is their desperate

19  attempt to recover from that.

20          The evidence will show that the information comprising

21  the purported trade secrets and purported confidentiality and

22  proprietary information was commonly known outside of

23  plaintiff's business, could easily be duplicated by any

24  competent personal injury attorney, did not give plaintiff an

25  advantage over any competitors, has no value to competitors.

F5j4spa1

1    And the use of the information, if any, was allowed since it

2    was for the benefit of clients, the true owners of this

3    information that they are alleging are trade secrets or

4    confidential information.  Thus, plaintiff will not be able to

5    show that it will likely succeed on the merits of its

6    misappropriation of trade secrets and breach of contract claim

7    or that it was irreparably injured since money damages here, if

8    there was any breach, is an adequate remedy.

9         Thank you.

10        THE COURT:  Mr. Kaufman, would the plaintiff call its

11   first witness.

12        MR. KAUFMAN:  Yes.  It is Mr. Adam Rossol.

13    ADAM ROSSOL,

14        called as a witness by the Plaintiff,

15        having been duly sworn, testified as follows:

16        THE DEPUTY CLERK:  Could you please state your name

17   and spell your last name for the court reporter.

18        THE WITNESS:  Adam H. Rossol, R-O-S-S-O-L.

19        MR. SCHEIMAN:  May I proceed, your Honor?

20        THE COURT:  You may inquire, Mr. Scheiman.

21   DIRECT EXAMINATION

22   BY MR. SCHEIMAN:

23   Q   Good afternoon.

24   A   Good afternoon.

25   Q   Where are you presently employed, sir?

1   A    Spar, Bernstein & Lewis.

2   Q    What is Spar, Bernstein & Lewis?

3   A    A multidisciplinary law firm.

4   Q    How long have you been with Spar & Bernstein?

5   A    Since August 29, 2014.

6   Q    Did you attend college?

7   A    Yes, I did.

8   Q    When was that?

9   A    I graduated in 2001 from Boston University.

10  Q    You attended law school; did you not?

11  A    Yes, I did.

12  Q    When did you graduate from law school?

13  A    2007.

14  Q    What law school was that?

15  A    St. John's.

16  Q    Did you receive any honors in law school?

17  A    I was on the board of directors of the Trial Institute.

18  Q    Are you admitted to practice in New York?

19  A    Yes, I am.

20  Q    Any other jurisdiction?

21  A    Massachusetts.

22  Q    Are you admitted in any federal court?

23  A    Massachusetts Federal Court and the Southern and Eastern

24  Districts of New York.

25  Q    What area of law do you practice presently?

1    A    Personal injury, plaintiff.

2    Q    When you first graduated from law school, what area of law

3    did you practice in?

4    A    For about a month, personal injury plaintiff; and then

5    personal injury defense.

6    Q    After that month, did you go to a law firm?

7    A    Yes, I did.

8    Q    What law firm was that?

9    A    Gallagher, Walker, Bianco & Plastaras in Mineola.

10   Q    What area of law did that law firm practice in, mainly?

11   A    Personal injury defense.

12   Q    What was your job there?

13   A    I was an associate attorney, defending matters in

14   self-insured Fortune 500 Corporations, as well as actions

15   against insureds by their insurance carriers.

16   Q    As part of your duties at that firm, what did you do on a

17   daily-type basis?

18   A    I was an associate, and I reported to all the partners in

19   the firm, working on litigation of actions, defending them;

20   engaging in discovery, motions, demands, summary judgment

21   motions, both making and opposing them; limited depositions;

22   court coverage, both in state and federal courts.

23   Q    As part of your duties, you said you represented Fortune

24   500 self-insured and insurance companies.  Did that require any

25   special work by you?

1    A    Yes.   There was reporting on a regular basis to the

2    insurance carriers or the general counsel's office of a

3    corporation as to the developments in the case, progress in the

4    case, strengths and weaknesses in the case, pretrial reports,

5    things like that.

6    Q    How did you decide the strengths and weaknesses of the

7    case?

8    A    Evaluating all the evidence in the file that had been

9    revealed up to that point either through testimony or

10   documentary evidence, medical records, police reports, things

11   like that.

12   Q    How long did you stay at Gallagher, Walker?

13   A    I was there approximately two years.

14   Q    After that, did you go to another law firm?

15   A    I did.

16   Q    What law firm was that?

17   A    Robinson & Yablon, PC.

18   Q    What type of law did Robinson & Yablon practice?

19   A    Personal injury, plaintiff.

20   Q    What did you do there?

21   A    I was an associate attorney, working under Joel Robinson,

22   in the litigation of plaintiffs' personal injury cases.  I also

23   served as an attorney/underwriter for a firm's client, which

24   was a legal funding company.

25   Q    Describe, if you can, what a legal funding company is.

1   A   It advances money to personal injury plaintiffs on a

2   non-recourse basis; and at the conclusion of the matter, if

3   they're successful, then they owe back the principal plus

4   interest, and if they are unsuccessful in their matters, if

5   they lose, they owe the funding company nothing, zero.

6   Q   What does an underwriter do in that situation?

7   A   Reviews the case file as submitted by the funding

8   applicant, whether it be the plaintiff themselves or their

9   attorneys, and evaluates the likelihood of success and

10  potential value of those cases, to reach a funding decision as

11  to whether or not to fund and, if to fund, how much.

12  Q   What type of analysis do you do before you make a

13  recommendation, if you make recommendations to the funding

14  company?

15  A   What you do, what I did, was look at the fact pattern.  If

16  the case is in claim, you would look at reports, witness

17  statements, things like that.  You would also look at medical

18  records.  If the case is in suit, you're going to look at the

19  pleadings.  You'll look at the documents that particularize the

20  injuries and see what can be proven, what can't be proven, what

21  the problems are in the case, what the defenses are, the level

22  of competency of the attorney that is representing the

23  plaintiff in terms of their traffic record, if you will, and

24  you would use all of that information -- the insurance coverage

25  as well, the venue where it is being brought -- things of that

 1    nature in order to formulate an opinion as to whether or not

 2    this was an appropriate case to advance funding on.

 3    Q    Did you provide a report to the funding company?

 4    A    Yes.

 5    Q    How long did you stay at Robinson & Yablon?

 6    A    Five years.

 7    Q    After that, where did you go?

 8    A    Spar & Bernstein.

 9    Q    What were your duties at Spar & Bernstein when you were

10    first hired?

11    A    Personal injury attorney that initially was tasked with

12    reviewing the department's processes, practices, dynamics

13    amongst the people involved in the department, looking at kind

14    of best practices analysis, and creating a case inventory

15    analysis.  I also was tasked with working on client matters, as

16    I took them on, on a case-by-case basis.

17    Q    You see those books in front of you?

18    A    Yes.

19    Q    If you can turn to the document numbered 6.

20    A    Okay.

21    Q    Tell me what that document is.

22    A    This is a memo I drafted to David Lewis for the best

23    practices analysis dated October 2, 2014.

24    Q    Was that part of your duties that you first began when you

25    were hired by Spar & Bernstein?

F5j4spa1                    Rossol - direct

1    A    Yes.

2    Q    When you were hired by Spar & Bernstein, were you told what

3    your duties were going to be?

4    A    Yes.

5    Q    What were you told?

6    A    Just what I told you; that I would be sitting back and kind

7    of watching how the department functions and working on cases

8    and covering court and being a part of the team.

9    Q    Is Exhibit 6 for identification a result of your analysis

10   of best practices in the firm?

11   A    Yes.

12          MR. SCHEIMAN:  I move the admission, your Honor.

13          THE COURT:  Any objection?

14          MR. SCALISE:  No objection.

15          THE COURT:  All right.  Plaintiff's Exhibit 6 is

16   received.

17          (Plaintiff's Exhibit 6 received)

18   BY MR. SCHEIMAN:

19   Q    Would you turn to Exhibit for Identification Number 7 in

20   the same big book.

21   A    Okay.

22   Q    Would you tell me what that document is.

23   A    This is an exchange of email between myself, David Lewis

24   and Brad Bernstein about October 5th -- 3rd, 5th and 6th of

25   2014, which also included a memo involving a medical

1    coordinator position as something that should be implemented,

2    an idea.

3    Q    Is it also a best practices memo?

4    A    Yes.

5             MR. SCHEIMAN:  Move the admission of Exhibit 7, your

6    Honor.

7             THE COURT:  Any objection?

8             MR. SCALISE:  No objection.

9             THE COURT:  All right.  Plaintiff's Exhibit 7 is

10   received.

11            (Plaintiff's Exhibit 7 received)

12   BY MR. SCHEIMAN:

13   Q    Would you turn to that which has been marked as Plaintiff's

14   Exhibit 8 for identification.

15   A    Okay.

16   Q    Can you describe what that is?

17   A    An email dated October 31, 2014, from myself to Brad

18   Bernstein, David Lewis, Kim Edmonds, Doreen Amritt, Donette

19   Rosario, and Keesha, regarding intake specialist memorandum

20   that was attached.

21   Q    Was that also a best practices memo?

22   A    Yes.

23            MR. SCHEIMAN:  I move the admission, your Honor, of

24   Plaintiff's Exhibit 8 for identification.

25            MR. SCALISE:  No objection.

F5j4spa1                    Rossol - direct

1              THE COURT:  Plaintiffs exhibit 8 is received.

2              (Plaintiff's Exhibit 8 received)

3    BY MR. SCHEIMAN:

4    Q    I'm going to ask you to look at Exhibits 9, 10, 11, and 12,

5    if you can, and give a statement as to what they are.

6              Let me make it easier for you.  Were they all written

7    by you?

8              Go through them and tell me if they were all written

9    by you.

10   A    Yes, they were written by me.

11   Q    And were they also all best practices memoranda?

12   A    With the exception of 12, yes.

13   Q    What is 12?

14   A    12 is an end-of-year self-review that David Lewis assigned

15   to every employee in the firm, asking you to submit a glowing

16   memo about yourself.

17   Q    And in that particular exhibit, Exhibit 12, do you talk

18   about your work as analyzing best practices?

19   A    Yes.

20             MR. SCHEIMAN:  Your Honor, I would move 9, 10, 11, and

21   12 into evidence.

22             MR. SCALISE:  No objection, your Honor.

23             THE COURT:  Plaintiff's Exhibits 9, 10, 11, and 12 are

24   received.

25             (Plaintiff's Exhibit 9 through 12 received)

1   BY MR. SCHEIMAN:

2   Q    You also just testified just previously that you were asked

3   to create a personal injury inventory document; is that

4   correct?

5   A    Yes.

6   Q    Did you do so?

7   A    Yes.

8   Q    Please turn to Plaintiff's Exhibit 21 for identification.

9              Your Honor, this is one of the documents we're going

10  to ask be sealed.  The courtroom has no one here, so I don't

11  have to move, as previously discussed, in terms of trying to

12  have an empty courtroom except for the parties.  I will say

13  that I'm beginning to ask to have this sealed later in the

14  proceeding.

15             THE COURT:  The exhibits are not going to be docketed

16  on ECF, so I don't see the need to seal it.

17             MR. SCHEIMAN:  If they're not going to be docketed

18  your Honor --

19             THE COURT:  They're not going to be docketed, so let's

20  go.

21             MR. SCHEIMAN:  That's a solution.

22  BY MR. SCHEIMAN:

23  Q    Can you tell me, Mr. Rossol, what this document is?

24  A    This is a draft of the personal injury inventory analysis

25  and audit that I sent to Adam Handler on October 15th, as he

 1   had requested.

 2   Q   How was that request made?

 3   A   Orally.

 4   Q   Did he tell you why he wanted it?

 5   A   He wanted to see it.  He told me he wanted to see it.

 6   Q   And no further description of why?

 7   A   He was interested in it at the time.

 8   Q   Let's take a look at the document.  I'll skip through the

 9   first few columns in terms of what they are because it is

10   fairly obvious.

11           There appears to be an item number; is that correct?

12   A   Yes.

13   Q   There appears to be a name of a client; is that correct?

14   A   Yes.

15   Q   And then there is a type.  Describe what type means.

16   A   The type of personal injury case it was in terms of

17   liability, a general fact pattern.

18   Q   Next column is coverage; is that correct?

19   A   Date of incident.

20   Q   I'm sorry.  You're totally correct.  Small print.

21           Where do you get the information on date of incident?

22   A   It could have been from a police report.  It could have

23   been from the medical record.  It could have been from an

24   intake sheet that was filled out when the client first came in.

25   Variety of sources.  Case management software.

1    Q   How many of these analyses did you do to produce this

2    document, Exhibit 21?

3    A   The total document is roughly 300 cases.  I don't know what

4    this one was.  This was a draft before the final version.  I

5    don't know how far this one went.

6    Q   For each of the clients listed on this document, did you go

7    through the variety of sources that you just mentioned --

8    A   Yes.

9    Q   -- to get the date of incident?

10   A   Yes, I did.

11   Q   The next column is coverage?

12   A   Yes.

13   Q   What did you do to get that information?

14   A   I tried to find the insurance coverage disclosed by either

15   insurance carrier or defense firm on a case.  Sometimes there

16   was written correspondence from an insurance carrier.

17   Sometimes it was a discovery response from a defense firm.

18   Sometimes it was just verbal information provided over the

19   phone by an insurance company that was entered into matter

20   notes.

21   Q   Would you look at the next column, which I believe is

22   labeled injury.

23   A   Okay.

24   Q   Where did you get that information?

25   A   Looking at the medical records of the clients in the files,

1    looking at again sometimes the matter notes, if the medical

2    records weren't ordered yet, if there was just some information

3    jotted down about that; intake sheets as well, if a client came

4    in and told us that they broke their arm, I would write that on

5    the injuries.

6    Q    Looking down at column, if you would, just briefly, can you

7    tell us whether or not there is any medical information

8    contained therein?

9    A    Yes.  It is all medical information.

10   Q    Is any of that information, insofar as your practice is

11   concerned, confidential?

12   A    Absolutely.

13   Q    Go to the next column, if you would.  It says surgery, I

14   believe.

15   A    Okay.

16   Q    What significance does that have?

17   A    This lists whether or not the plaintiff had surgery, as

18   reflected in the file, or if it is pending, or if there is no

19   way to tell based upon what is in the file.  And that relates

20   to value because you're talking about whether or not the person

21   ended up having invasive treatment as related to their

22   injuries.

23   Q    Go to the next column.  I think it says venue.

24   A    Okay.

25   Q    What difference does it make in analysis of the case, if

1  you will, as to what the venue is?

2  A    Historically, jury verdicts are higher in certain counties

3  and lower in others, and so the venue relates to the potential

4  verdict value of a case, which affects its settlement value.

5  Q    And the next column says in suit or not.  I think that is

6  fairly obvious, but how do you ascertain that information?

7  A    If there is a filed complaint in the file, it is in suit.

8  If not, it is not.  If it is not a lawsuit case, in other

9  words, the UM symbol stands for uninsured motorist.  That is an

10  arbitration proceeding that the state has set up.  So it is

11  outside of litigation.

12  Q    Does that affect value of the case in any way?

13  A    It does.

14  Q    Explain how.

15  A    The uninsured motorist arbitration is known to be rather

16  conservative in its awards amongst personal injury

17  practitioners.

18  Q    Go to the next column, which says status.  Where do you get

19  that information?

20  A    Review the file, just seeing what has been done recently,

21  what is remaining to be done.  That is a kind of a next-step

22  thing.  If there is an offer that is found, or if a demand has

23  been made.  A number of things.  Just basically jotting down

24  information about the case that would affect the value and its

25  progress.

Q   Going down that column, can you see anything that is

contained in that column that is medically related?

A   Yes.

Q   Give me an example of what is indicative of medically

related.

A   In the second one, Adiaha Ekenem.  So this case, in the

injury column, it lists there was a blood clot in the brain,

six-day coma with brain surgery, and a prior stroke in 2008.

So it looks like a really bad injury.  But in the status for

such bad head injuries, there is no superficial signs of blunt

force trauma to the head, and there is an eyewitness that the

store has that says the plaintiff was standing there and just

fell.  That is medical information about a problem with the

case.

Q   What would this information mean to a defense counsel?

A   That this matter is defensible and this matter may not be

causally related to the incident.

Q   In your practice, do you consider that information

confidential?

A   Yes.

Q   What steps does the firm take to ensure that there is some

confidentiality with respect to this information?

A   We are all assigned an email address and a computer that is

password-protected.  You can log in and use your computer.

When you're not at your computer, you log out.  Same thing with

1    the iPhones that are assigned to the attorneys; those phones,

2    you get your work email on it, but it is password-protected.

3    No one can access it unless they know your password.  With

4    respect to digital information, which this document was kept on

5    my desktop, it was secured by my password and by my logging out

6    when I wasn't at my desk.

7         We all have to sign a confidentiality agreement, not

8    only attorneys but employees, as well, that we acknowledge that

9    we're handling private and sensitive information on behalf of

10   clients and the firm and that we will take safeguards to

11   protect that information, and if we leave the firm, that we

12   have to give back anything that we have.

13   Q    All right.  Would you take a look at the page that is

14   Bates-stamped SB 001395, which is the first page of the exhibit

15   you have been looking at.

16   A    Okay.

17   Q    Count up five lines from the bottom.  Without saying the

18   name of the client, can you read that?

19   A    Still going -- is it that one?

20   Q    Yes.

21   A    Still going to PT.  Has refused injections but is

22   considering.  No specials yet.

23   Q    Is that medical information?

24   A    Yes.

25   Q    Is that confidential?

1    A    Yes.

2    Q    When did you first begin working on this inventory?

3    A    September of 2014.

4    Q    And what was the date that this was finally produced?

5    A    October-- late October, October 24th-ish, 2014.

6    Q    You sent this to Mr. Handler on October 15th; is that

7    correct?

8    A    A draft, true.

9            MR. SCHEIMAN:  I would move 21 into evidence, your

10   Honor.

11           MR. SCALISE:  No objection.

12           THE COURT:  All right.  Plaintiff's Exhibit 21 is

13   received.

14           (Plaintiff's Exhibit 21 received)

15   Q    When you were asked to prepare this inventory, were you

16   given any special instructions?

17   A    Yes.

18   Q    What were those instructions?

19   A    David Lewis wanted me to make sure that I went through

20   every file.  He wanted certain pieces of information in there.

21   He wanted to know what the insurance coverage was, whether or

22   not the matter was in suit, and what I thought about the

23   strength of the case, potential value of it.  He wanted a sense

24   of that.  What the quality of the inventory was.  He wanted to

25   make sure I performed this and that it was my own opinion and

F5j4spa1                    Rossol - direct

1  work.

2  Q   Going back to 21, which you still have in front of you --

3  is that correct?

4  A   Yes.

5  Q   On the last column, you'll see something called grade.

6  A   Okay.

7  Q   It appears there is A, B, and C grades given to cases.

8  A   Correct.

9  Q   Did you determine what the grade would be?

10 A   I did.

11 Q   How did you come to make that determination?

12 A   Based upon a review of all of the columns before the letter

13 grade, I assigned the case as a grade A through C, with A being

14 the best cases, B being cases that were good but there was an

15 issue that needed to be worked on, C cases were cases that

16 weren't very strong.  And this was an analysis, combining

17 potential financial value of the case as well as likelihood of

18 success on the merits, not taking into account dollar amount.

19 Q   So let me give you a hypothetical if I can.

20 A   Okay.

21 Q   You have a rear-end collision and you have multiple

22 fractures.  It is a serious accident.  And you have surgery

23 required.  And you have a $10,000 policy.  What type of grade

24 do you think you would assign?

25 A   Was there surgery?

F5j4spa1                    Rossol - direct

1    Q    Let's say surgery was necessary but you don't know if

2    surgery was undertaken.

3    A    $10,000 of insurance?

4    Q    Correct.

5    A    B.

6    Q    Why would you give it a B?

7    A    $10,000 is a very low number relative to the likelihood of

8    success on the merits.  It still warrants a B.

9    Q    If I gave you the same facts but altered it to say it was a

10   $100,000 policy --

11   A    A.

12   Q    Let me finish my question, if you don't mind.

13            Why would you give it an A?

14   A    Because a case like that is worth every ounce of the

15   $100,000, and liability is basically ensured in a rear-end

16   case.

17   Q    Let's change the facts once again, and that is a $10,000

18   policy, was venued in the Bronx, and you had another case that

19   had the exact same facts and the venue was in Nassau.  Would

20   that change the grade or would the grade stay the same?

21   A    Same injuries we just discussed?

22   Q    Same fact pattern.

23   A    No, it wouldn't affect it because you can get that money in

24   Nassau, as well.

25   Q    If it was a question as to coverage and you were venued in

1    the Bronx as opposed to venued in Nassau, would that affect the

2    grade?

3    A    Yes.

4    Q    In what way?

5    A    The Bronx case would have a potential value that would be

6    greater than the potential value in Nassau.

7    Q    Did you go through this type of analysis with varying

8    factors affecting the grade for over 300 cases?

9    A    I did.

10   Q    Let me ask you to turn to that which has been marked for

11   identification as Plaintiff's Exhibits 22 and ask you if you

12   have seen this document before.

13   A    Yes.

14   Q    And describe, if you would, what the document is.

15   A    This was the completed assignment of the personal injury

16   inventory analysis and audit that was given to Brad and David.

17   Lennie was copied on this particular email, the firm

18   administrator.

19   Q    What is the date of the document?

20   A    October 24, 2014.

21   Q    At that point in time, was your analysis of cases complete?

22   A    For the most part, after this, I found a few additional

23   files that were in people's offices and added to it, but for

24   the most part this was the final document.

25   Q    From the first draft of this type of document until you

1    produced this document on October 24th, how much time did you

2    spend on working on this task?

3    A    From a month to a month and a half.

4    Q    How much time during the day?  An hour or more?

5    A    More.

6    Q    How much more?

7    A    In the beginning, it was about 40 percent of my time.

8    Then, as we got closer to October 24th, it became pretty much a

9    hundred percent of the time.

10   Q    And I see it is addressed to Bradford Bernstein.

11   A    Yes.

12   Q    Can you tell the Court who that is.

13   A    Bradford Bernstein was the president of Spar & Bernstein

14   and is a partner in Spar, Bernstein & Lewis.

15   Q    It is also addressed to David Lewis?

16   A    Yes.

17   Q    Who is Mr. Lewis?

18   A    David Lewis was the general counsel of Spar & Bernstein and

19   is a partner in Spar, Bernstein & Lewis and general counsel.

20   Q    I think you said Lennie Strat was also listed there as the

21   firm administrator.

22   A    Yes.

23   Q    Was this document distributed to anyone else other than

24   those on the list?

25   A    Yes.

F5j4spa1                    Rossol - direct

1   Q    Who was the other person or persons?

2   A    Adam Handler, Kimberly Edmonds.

3            MR. SCHEIMAN:  Your Honor, I would move Exhibit 22

4   into evidence, please.

5            MR. SCALISE:  No objection.

6            THE COURT:  Plaintiff's exhibit 22 is received in

7   evidence.

8            (Plaintiff's Exhibit 22 received)

9

10  BY MR. SCHEIMAN:

11  Q    Would you turn to the next exhibit, which is Exhibit 23.

12  A    Okay.

13  Q    Have you seen that document before?

14  A    Yes.

15  Q    What is it?

16  A    The same list that I emailed to Brad, David, and Lennie on

17  October 24, 2014.

18  Q    To whom is this addressed?

19  A    Adam Handler.

20  Q    Why did you send it to Mr. Handler?

21  A    He wanted a copy of it.

22  Q    Did you have any discussions about the document when you

23  sent it to him?

24  A    He wanted to see the document.  I emailed it to him.  He

25  then -- I guess after that we had another conversation where he

1    said he was impressed by it and that it was exhaustive, a lot

2    of work, and a valuable document.

3    Q    What was the last point?

4    A    A valuable document.

5    Q    What did he say about the value of the document?

6    A    He wanted to turn a great list into a $5 million list, just

7    add phone numbers, something to that effect.

8    Q    When did you have that conversation?

9    A    Shortly after giving him the final list.

10   Q    Was it in his office or your office or someplace else?

11   A    My office.

12   Q    Did Mr. Handler come to your office to discuss the list?

13   A    Yes.

14   Q    Is this list significantly different from the October 15th

15   list?

16   A    It's longer.

17   Q    More cases?

18   A    Yes.

19        MR. SCHEIMAN:  Your Honor, I would move Exhibit 23

20   into evidence.

21        MR. SCALISE:  No objection.

22        THE COURT:  Exhibit 23 is received.

23        (Plaintiff's Exhibit 23 received)

24

25

1    BY MR. SCHEIMAN:

2    Q    Did there come a time when you, Mr. Handler, and others met

3    concerning this list?

4    A    Yes.

5    Q    When was that?

6    A    In November of 2014, I think it was the second week, to

7    assign the cases to different attorneys.

8    Q    How long did that meeting last?

9    A    A couple of hours; two, three hours.

10   Q    Who was in attendance?

11   A    Brad Bernstein, David Lewis, myself, Adam Handler, Kimberly

12   Edmonds.

13   Q    Tell me what you did at the meeting.

14   A    Distributed a hard copy of the list to everyone in the

15   meeting.  And then sat there and, as Brad ran down the names on

16   the list, noted who each case was assigned to.

17   Q    How long did that process take?

18   A    Several hours; two, three hours, something like that.

19   Q    What contributions did Mr. Handler make to that meeting?

20   A    Indicating cases he wanted.

21   Q    Did he give a basis for his desire for any particular case?

22   A    No, other than maybe having a personal interest or knowing

23   the person.  He would express stuff like that.

24   Q    Did there come a time when notice was taken of the type of

25   cases Mr. Handler was asking about?

1    A    Yes.

2    Q    And what happened then?

3    A    There was a balancing that went -- every -- I don't know --

4    approximately 30 cases or so, 20, 30 cases.  Somebody was

5    keeping stock of how many each attorney was being assigned in

6    terms of caseload, because we were trying to keep a balanced

7    caseload, as appropriate.  And there was a remark that, you

8    know, we gave Handler a bunch of A's, we have to give Rossol

9    some A's, Kim has got to get A's.  She ultimately got less than

10   both of us.  Brad was saying something like that.  There was a

11   balancing to make sure that everybody got a mix of cases.

12   Q    Did anyone express anything with respect to Mr. Handler's

13   focus on A cases?

14   A    I think that's where the balancing started because he was

15   getting more of them than Kim or I.

16   Q    At his request?

17   A    When he indicated he wanted a case, it was generally in the

18   beginning just getting the case.

19   Q    Would you turn your attention to Plaintiff's Exhibit 24 for

20   identification.

21   A    Okay.

22   Q    Can you tell the Court what that document is.

23   A    November 12th, okay, so this is the document I created

24   after we had the meeting distributing the cases to the three

25   attorneys.  I added a column and listed the attorney that the

1    case was assigned to, and emailed that list, the inventory, to

2    Giselle Bobadilla, and copied everybody that was in the

3    meeting.

4    Q    When was this document produced?

5    A    November 12, 2014.

6    Q    That was the result of the discussions that were had with

7    respect to assignment of cases?

8    A    Directly.

9              MR. SCHEIMAN:  I move Exhibit 24 in evidence, your

10   Honor.

11             MR. SCALISE:  No objection.

12             THE COURT:  Exhibit 24 is received.

13             (Plaintiff's Exhibit 24 received)

14

15   BY MR. SCHEIMAN:

16   Q    When you were going over the earlier drafts and having

17   discussions from time to time with Mr. Handler, what was the

18   subject matter of the discussions?

19   A    They were twofold:  One was that he was concerned about

20   some of the phrasing, some of the characterization of the shape

21   of a case, what kind of shape it was in.  For example, if I

22   said something like -- if I wrote in the document, you know,

23   nothing done in eight months on this file, he expressed that he

24   was disappointed and upset that I wrote something like that,

25   that it would make him look bad.  That was for a few of them.

1   Then, the other side of it was, he was taking an interest in

2   cases that there was work to be done, it was clear, and that he

3   was trying to do the work to make the information on the list

4   obsolete in a sense, you know, that whatever wasn't done was

5   now being done, so I couldn't say that stuff wasn't done.  He

6   was using it for information.

7   Q   So did you form an impression at that point in time when

8   these internal drafts were being given to Mr. Handler as to

9   whether or not he was acquainted with the details in the

10  drafts?

11  A   He was very much.

12  Q   You said that the firm tries to maintain the

13  confidentiality of this particular document; is that correct?

14  A   Yes.

15  Q   Where is it located today in its most recent form?

16  A   Outside of discovery in this case, it is on my desktop.

17  Q   Any other place?

18  A   No.

19  Q   When you had in your hands at this meeting a hard copy of

20  the document, did you make any plans to dispose of that hard

21  copy?

22  A   I shredded mine.

23  Q   Do you know whether or not anybody else took any particular

24  pains to keep the document confidential?

25  A   I do not.  I do not.

1   Q    Did you ever speak to Kimberly -- I'm sorry I forgot her

2   last name.

3   A    Edmonds.

4   Q    Yes, Ms. Edmonds -- with respect to the way she was keeping

5   her list?

6   A    Yes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. SCHEIMAN:

2    Q.  And when did you have that discussion?

3    A.  Ongoing, to this day.

4    Q.  What did you say and what did she say?

5    A.  She was maintaining her list as it pertained to her, the

6    cases she was and has continued to be assigned to on her

7    computer.  I believe that is the only list that she still has.

8    Although she's not in -- told me she destroyed the initial list

9    that she was handed but -- and she's taken the list that she's

10   had and she -- she's added to it, she's color coded, things

11   like that, but she keeps it on her desktop.

12   Q.  And did you give any instructions to the paralegal who

13   works for you with respect to security of the document?

14   A.  Sure.  I sent her, Derlin Barrios, a -- the portion of the

15   master list of cases that were just assigned to me.  I didn't

16   send her the entire thing, 'cause she didn't need to know

17   everybody's cases.  And I told her to keep that on her desktop

18   and, again, just log in and log out when you're not in your

19   computer, making that and almost everything else confidential.

20   Q.  I'd like to direct your attention to Exhibit 29.

21   A.  Okay.

22   Q.  And describe for your Honor what that document is.

23   A.  The email I never received, but after the email, the

24   confidentiality agreement that I signed, when I joined the

25   firm.

1   Q.  And this is dated July 23rd, is that correct?

2   A.  Yes.

3   Q.  You had not been hired at that point in time, is that

4   correct?

5   A.  I was hired on or about that time, but I had not started

6   yet.

7   Q.  When did you start work?

8   A.  In August, late August, August 29th.

9   Q.  And when you began work on August 29th, were you given a

10  copy of the confidentiality agreement?

11  A.  Yes.

12  Q.  Did you read it?

13  A.  Yes.

14  Q.  Did you sign it?

15  A.  Yes.

16  Q.  Was that required for all employees, to your knowledge?

17  A.  Yes.

18  Q.  And going back to the covering email, looking at the list

19  of addressees, can you tell me whether or not that's only

20  attorneys or is it attorneys and paralegals or who was included

21  on that list?

22  A.  Attorneys, paralegals, office staff, nonlegal roles.

23  Q.  As far as you know, were they all employees?

24  A.  It appears to be.

25          MR. SCHEIMAN:  Your Honor, I would move into evidence

1    Plaintiff's Exhibit 29.

2              MR. SCALISE:  No objection.

3              THE COURT:  Plaintiff's Exhibit 29 is received.

4              (Plaintiff's Exhibit 29 received in evidence)

5    Q.  Would you direct your attention to Exhibit 27.

6    A.  Okay.

7    Q.  What is that document?

8    A.  The Spar & Bernstein employee handbook.

9    Q.  And did you receive a copy of this handbook?

10   A.  Yes.

11   Q.  When did you receive a copy?

12   A.  The first day I started.

13   Q.  And do you know whether or not other employees received

14   that document?

15   A.  Everybody did.

16   Q.  If you look at the last page contained on the document, can

17   you tell me what that is.

18   A.  The last page?

19   Q.  Yes.

20   A.  Acknowledgment page that you received it, read it,

21   understand it, and you have to sign.

22   Q.  And did you do that?

23   A.  Yes.

24   Q.  And besides this confidentiality agreement and the

25   handbook, did you have any other understanding of your

1   obligations as an attorney with respect to confidentiality?

2   A.  Yes.

3   Q.  And what was that understanding?

4   A.  As firm -- from the firm's perspective or my own?

5   Q.  Both.

6   A.  Okay.  As a lawyer, that we're supposed to keep clients'

7   information confidential; only discuss and view things on a

8   need-to-know basis for their cases; don't talk about client

9   information in public spaces.  As a personal injury lawyer, we

10  deal with medical records and so I understand that we have to

11  abide by HIPAA, which is basically the patient's right to

12  privacy for their medical records, that they have to give us

13  permission to receive those documents, to disclose those

14  documents, and that we have to abide by that, and that that

15  authorization can be revoked by the client at any time in

16  writing.  But they don't have to give it to us in writing.

17  That as a firm, confidentiality is an important thing; the fact

18  that we have to -- we sign that agreement over and above our

19  obligation as an attorney; that we have to return documents if

20  we leave the firm that are confidential; that -- that your

21  phone, you have to keep your phone protected, you know, if

22  you're going to have client information on that, it's got to be

23  for your eyes only.  Things like that.

24  Q.  If you direct your attention again to Plaintiff's 27 for

25  identification and turn your attention to page 26 of that

1  document, I have a couple of questions for you.

2  A.   Okay.

3  Q.   Do you see the section in the handbook that says

4  Confidentiality?

5  A.   Yes.

6  Q.   And when you received the document, the handbook, did you

7  read that?

8  A.   Yes.

9  Q.   Do you know whether or not other employees were told to

10 read the handbook when they were hired or when they continued

11 in the employ?

12 A.   Yes.

13 Q.   And what does this paragraph labeled Confidentiality mean

14 to you?

15 A.   Of all the things bullet pointed, that you're supposed to

16 abide by them.

17 Q.   Is it any different from your obligations as an attorney

18 bound by canons?

19 A.   Yes.

20 Q.   How is it different?

21 A.   I don't think the attorney canons care whether or not I

22 discuss my salary with people.  Business information, if it's

23 not relating to the client or to the firm's financial

24 information, I don't know if that's something that has to be

25 kept confidential.  You know, who you use for your copy

1    machine, for example.

2    Q.  Look at the second bullet, if you would.

3    A.  Okay.

4    Q.  Does that tell you anything beyond that which you're

5    required to abide by under the canons?  They used to be called

6    the canons.  I guess I'm dating myself.

7    A.  No.  I think that's kind of similar, if not the same.

8    Q.  Do you know whether or not Mr. Lewis or Mr. Bernstein

9    sought to enforce the confidentiality agreement and/or the

10   paragraph that we just looked at in the handbook?

11   A.  I think that's what we're sitting here doing right now.

12   Q.  Beyond this lawsuit, do you know whether or not anybody has

13   been spoken to with respect to keeping things confidential when

14   there's an apparent breach of the terms of the confidentiality

15   agreement or the confidentiality paragraph that we just looked

16   at?

17   A.  I don't recall.

18   Q.  Sitting here today, do you consider documents 21 through 24

19   to be confidential?

20   A.  Yes.

21   Q.  And do you take any steps that you haven't already

22   mentioned to keep those documents confidential and secure?

23   A.  Could you repeat that.  I'm sorry.

24   Q.  Yes.  Do you take any steps that you haven't already

25   mentioned to keep those documents confidential and secure?

1   A.   No.

2   Q.   You've told us everything that you do.

3   A.   Yes.

4           MR. SCHEIMAN:   Okay.  If I might have a moment, your

5   Honor.

6           THE COURT:   Take your time.

7           MR. SCHEIMAN:   Mr. Rossol, I have no further

8   questions.  I thank you for your time and attention.

9           THE WITNESS:   Okay.

10          THE COURT:   All right.  Cross examination,

11  Mr. Scalise.

12          MR. SCALISE:   Yes, your Honor.

13  CROSS EXAMINATION

14  BY MR. SCALISE:

15  Q.   Good afternoon, Mr. Rossol.

16  A.   Hi.

17  Q.   Mr. Rossol, the source for the information that went into

18  what you've testified as Plaintiff's Exhibit 24, that was

19  basically from various client files, correct?

20  A.   Hold on.

21  Q.   Take your time.

22  A.   The data is from the client files.

23  Q.   The data.

24  A.   Correct.

25  Q.   I understand.  And that would have been something like

1    intake sheets?

2    A.   Yes.

3    Q.   Medical records?

4    A.   Yes.

5    Q.   Insurance documents?

6    A.   Yes.

7    Q.   Notes from the attorney that's handling that case, correct?

8    A.   Yes.

9    Q.   Okay.  And looking at no. 24 again, you have these various

10   headings on here, starts from Matter and it goes across to the

11   Grade, do you see that?

12   A.   Yes, I do.

13   Q.   Okay.  Now the Matter Number, that's simply a Spar

14   Bernstein internal number that allows the firm to track the

15   case, correct?

16   A.   Yes, a file number.

17   Q.   Okay.  That's a file number.  And there are times that that

18   number is disclosed outside of Spar & Bernstein, correct?

19   A.   Yes.

20   Q.   And as a matter of fact, Spar Bernstein as part of its

21   policy will put on letters, whether it's a demand letter or

22   other letters, a file number so that they can reference it,

23   correct?

24   A.   I don't know if it's a policy, but it happens.

25   Q.   Okay.  And would you admit that there's no benefit to some

1    competitor to have the matter number?

2    A.   Yes.

3    Q.   There would be no benefit to the competitor.

4    A.   Not that I can think of.

5    Q.   Okay.  And looking at the client name, that would be

6    something that would be disclosed outside of Spar & Bernstein,

7    correct?

8    A.   Yes, at the appropriate time and to the appropriate people.

9    Q.   Okay.  Well, generally, one of the first things, my

10   understanding, personal injury plaintiffs do is they will send

11   some type of a demand letter out to an insurance carrier, is

12   that correct?

13   A.   Yes.

14   Q.   Okay.  And that the name of the client would be in that

15   demand letter, correct?

16   A.   Yes.

17   Q.   Okay.  And as a matter of fact, there is a requirement, a

18   court rule, that attorneys who are engaged in personal injury

19   cases file with the Office of Court Administration within 30

20   days of having been retained a retainer statement, correct?

21   A.   Yes.

22   Q.   Okay.  And in the retainer statement the name of the client

23   would also be disclosed --

24   A.   Yes.

25   Q.   -- correct?  And that's a public document, correct?

1    A.  I don't know who can obtain retainer statements as a matter

2    of public request.

3    Q.  They're filed with the Office of Court Administration,

4    correct?

5    A.  True.

6    Q.  Okay.  And the date of incident that you mention on here?

7    A.  Okay.

8    Q.  So let me back up, because I notice that on the one we're

9    talking, plaintiff's exhibit, it has a listing for Attorney,

10   correct?  You see that?

11   A.  The column, yes.

12   Q.  The column.  Okay.  And that would commonly be disclosed to

13   somebody outside of Spar Bernstein, correct?

14   A.  Yes, that's disclosed at some point.

15   Q.  Okay.  And going over to the next heading, the Type, where

16   I'm assuming that means the type of case that is, would that be

17   disclosed at some point outside of Spar Bernstein?

18   A.  The fact pattern of --

19   Q.  Whether it's a motor vehicle accident, whether it's a slip

20   and fall, that information would be known outside of Spar

21   Bernstein, correct?

22   A.  To the appropriate parties, yes.

23   Q.  Okay.  And the date of incident, that would be something

24   that would be disclosed outside of Spar Bernstein, correct?

25   A.  Yes.

 1    Q.  Okay.  That would either be in a demand letter, correct?

 2    A.  It would be.

 3    Q.  Retainer statement filed with OCA?

 4    A.  Yes.

 5    Q.  Or in a bill of particulars, correct?

 6    A.  Served on defense counsel, yes.

 7    Q.  Okay.  And what's your understanding of what a bill of

 8    particulars is in a personal injury case?

 9    A.  It's an amplification of the pleadings.

10    Q.  And that's generally used by defense counsel when they

11    serve their answer, is that not correct?

12    A.  That's not correct?

13    Q.  That's not correct.

14    A.  No.

15    Q.  Okay.  Who generally serves the bill of particulars?

16    A.  Whoever is demanded to produce one.

17    Q.  When you were working for defense counsel, the Gallagher

18    law firm, did you utilize bills of particulars, demands for

19    bills of particulars?

20    A.  In state court actions, yes.

21    Q.  Okay.  Now the insurance coverage, that information that's

22    under there, that would be disclosed outside of Spar Bernstein,

23    correct?

24    A.  To the client?

25    Q.  Just would that be known outside of Spar Bernstein?

F5j1spa2                    Rossol - Cross

1    A.  Yes.

2    Q.  In fact, the insurance carrier would have that information,

3    correct?

4    A.  It's their information.

5    Q.  Okay.  And the injury, would that information be known

6    outside of Spar Bernstein?

7    A.  Subject to HIPAA.

8    Q.  Okay.  And but defense counsel would get that, correct?

9    A.  What they're entitled to.

10   Q.  Well, have you ever had a situation -- withdrawn.

11           Have you had the opportunity to settle cases?

12   A.  Yes.

13   Q.  Have you ever settled a case with the insurance carrier

14   where the insurance carrier did not know the injury that you

15   were claiming the plaintiff suffered?

16   A.  No.

17   Q.  Okay.  And the fact whether or not the client had any type

18   of surgery, that would be commonly known outside of Spar

19   Bernstein, would it not?

20   A.  Commonly?  No.

21   Q.  Well, it would be known outside of Spar Bernstein -- let me

22   rephrase that.

23   A.  Again, subject to HIPAA, yes.

24   Q.  Okay.  And the insurance carrier that you're asking to get

25   money from, they would know whether or not there was surgery,

1    correct?

2    A.   Sometimes.

3    Q.   Okay.  And in any bill of particulars, if there was one

4    that was demanded, that would be known, correct?

5    A.   Supposed to be.

6    Q.   Okay.  And the venue of the case, would that be known

7    outside of Spar Bernstein?

8    A.   Once it's put in suit, yes.

9    Q.   Okay.  And based upon the facts of the case, even before it

10   is put in suit, insurance company gets notice of a claim, they

11   would be able to make an assumption as to where venue could

12   possibly lie, correct?

13   A.   They would make their assumption of the different venues

14   available, if there were more than one, like we would.

15   Q.   And you're familiar with the CPLR, the Civil Practice Law

16   and Rules as it relates to venue of actions?

17   A.   Yes.

18   Q.   And I believe you'd even testified earlier that in some

19   cases you want to try to get the case in a particular venue

20   because it may be more beneficial to the client if you're in a

21   certain jurisdiction, such as the Bronx, isn't that correct?

22   A.   Generally, that's correct.

23   Q.   Okay.  And whether or not the case is in suit, that would

24   be known outside of Spar Bernstein, if in fact it was in suit,

25   correct?

1    A.   Yes.

2    Q.   And even if it's not in suit, the insurance company would

3    know whether or not the case is in suit, correct, or not in

4    suit?

5    A.   Yes.

6    Q.   Okay.  And looking at the status of the case, the insurance

7    carrier would know what the status of the case is, correct?

8    A.   Their status of the case.

9    Q.   I understand, but they would know the status of the case,

10   whether bills of particulars has been served, whether

11   depositions had been taken, correct?

12   A.   In a litigation they would know the steps that had been

13   taken.

14   Q.   And are you familiar with preliminary conference orders?

15   A.   Yes.

16   Q.   Okay.  And in a preliminary conference order, that's

17   something that's issued by a court and it sets forth discovery

18   timetables, correct?

19   A.   True.

20   Q.   And that would, of course, list the status of the case,

21   EBTs need to be conducted by such and such a date, documents

22   need to be produced by such and such a date, interpleader

23   parties by such and such a date, all discovery done, completed

24   by such and such a date, correct?

25   A.   The litigation status in terms of scheduling, that's the

 1  only status that we list.

 2  Q.  Okay.  But there would be -- that would be something that

 3  would be known outside of Spar Bernstein at some point.

 4  A.  That's a publicly filed document.

 5  Q.  Okay.  Now you've talked a little bit about this grading,

 6  A, B, and C.  That grading system was something that you

 7  developed, correct?

 8  A.  Yes.

 9  Q.  Okay.  When we last spoke about it, you had told me that

10  the grading system was A meant best, B means good, and C meant

11  bad shape.  Is that correct?

12  A.  Yes, generally, yes.

13  Q.  Okay.  And you also testified that the grading system A

14  through C is something that was commonly known.  Do you

15  remember saying that?

16  A.  No.

17  Q.  Okay.  Matter of fact -- I'm sorry.  It wasn't -- you

18  didn't say commonly known; you said generally familiar.  Does

19  that refresh your recollection?

20  A.  No.

21  Q.  Okay.  As a matter of fact, you had mentioned that you got

22  this from school -- As are the best, Bs are good, and Cs not so

23  good?

24  A.  Well, you asked me why I used A through C, and we all know,

25  you know, in school, an A grade was the best grade, and down

1    the alphabet you go, it gets worse.

2    Q.  And as a matter of fact, you had said that's common sense,

3    correct?

4    A.  Yes.

5    Q.  Okay.  You could have used 1, 2, or 3, if you had chosen

6    to, also to delineate the grade of this case, correct?

7    A.  True.

8    Q.  You just decided to use A, B, C -- A, B, and C, correct?

9    A.  That's right.

10   Q.  Okay.  And you didn't create that grading system of A, B,

11   or C, correct, in general?

12   A.  I don't understand.

13   Q.  Okay.  I'll try to rephrase it.  A being the best, B being

14   good, C being not so good, that's a common grading system

15   that's used throughout the country, would you not agree?

16   A.  In the academic world, yes.

17   Q.  Okay.  And this grading system I believe you testified was

18   based on some type of common analysis of a case, correct?

19   A.  No.

20   Q.  It's not based on a common analysis of the case?

21   A.  I don't know what you mean by common analysis.

22   Q.  I'll rephrase it.  In order to determine the value of the

23   case, you had to analyze the case, correct?

24   A.  True.

25   Q.  Okay.  And you had done that at Spar Bernstein, correct?

1    A.   Yes.

2    Q.   And you've also analyzed cases while you were at the

3    Gallagher law firm, correct?

4    A.   Yes.

5    Q.   And you had analyzed cases when you were at the Robinson

6    law firm, correct?

7    A.   Correct.

8    Q.   Okay.  And some of the things that you mentioned that you

9    would look at would be the likelihood of success of the case,

10   correct?

11   A.   Yes.

12   Q.   Potential recovery?

13   A.   Yes.

14   Q.   Injuries?

15   A.   True.

16   Q.   Insurance coverage?

17   A.   Yes.

18   Q.   Strength of any legal theory?

19   A.   On liability, yes.

20   Q.   Okay.  So isn't it true that this analysis that you did

21   with respect to these cases is you gave a grade, is what every

22   competent personal injury lawyer does when they look at their

23   cases and determine the value of them?

24   A.   Generally, yes, you have to analyze the cases you have.

25   Q.   And in looking at this material here, would you not admit

1    that the information is primarily work product that you would

2    be using in order to make that analysis?

3    A.  Some of it's work product, some of it's just medical

4    records.

5    Q.  Right.  But the medical records would ultimately just be

6    disclosed to defense counsel at some point, correct?

7    A.  Not all of them.

8    Q.  They wouldn't be entitled to all the medical records?

9    A.  No.

10   Q.  Unless they were somehow protected by some type of

11   confidentiality, correct?

12   A.  Or whether or not they're even related.  In other words,

13   let's say the person has AIDS, but you're suing for a broken

14   arm.  The AIDS may not come in.  It may not be disclosed.

15   Q.  Okay.  I understand.  But what we're talking about is in

16   the context of a personal injury case, correct?

17   A.  Yes.

18   Q.  And that's what this Exhibit 24 was used for, for the

19   personal injury cases, correct?

20   A.  Yes.

21   Q.  Okay.  And this was used so that Spar Bernstein could try

22   to figure out how valuable their cases were.

23   A.  Among other things.

24   Q.  Okay.  Well, Spar Bernstein is in the business of

25   representing plaintiffs who have personal injury claims,

1    correct?

2    A.   True.

3    Q.   And when you represent -- withdrawn.

4            When a plaintiff personal injury firm is representing

5    a client, its primary goal is to recover as much money as

6    possible for that client, is that not true?

7    A.   Yes.

8    Q.   Okay.  And when we had spoken last, you had mentioned that

9    this document is an evolving document.  Do you remember that

10   conversation?

11   A.   I do.  At the deposition.

12   Q.   Okay.  Great.  And as a matter of fact, looking at some of

13   the other exhibits that came before this, we had talked about

14   the fact that it had changed because those other documents did

15   not have the Attorney column there, correct?

16   A.   Correct.

17   Q.   And in fact, that Attorney column was added after the fact,

18   after you had the meeting with Mr. Handler, Ms. Edmonds,

19   Mr. Lewis, and Mr. Bernstein to determine who was going to

20   handle the cases, correct?

21   A.   That's right.

22   Q.   Okay.  And isn't it true that in addition to this

23   information, this document is evolving, the grade of the case

24   can possibly change too?

25   A.   That's true.

1    Q.  For example, you could have a case that you think is an A

2    case and then, lo and behold, some of your evidence that you

3    think you have isn't appropriate anymore, correct?

4    A.  There could be a negative development.

5    Q.  Okay.  And this information that's in what's been marked as

6    Plaintiff's Exhibit No. 24, would a client be entitled to this

7    information for its particular case?

8    A.  Some of it.

9    Q.  What would the client not be entitled to?

10   A.  Whether the firm grades the case an A, a B, or a C.

11   Q.  They wouldn't be entitled to know what the firm thought

12   about the value of the case?

13   A.  They absolutely are, but as it relates to the other cases

14   of the firm, that's a -- the firm information.

15   Q.  I'm not talking about the other cases.  I'm talking about

16   for each client, would that particular client be entitled to

17   each and every item in that particular listing for their

18   particular case?

19   A.  No.

20   Q.  They would not be entitled to know what the status of the

21   case was?

22   A.  Yes, they are entitled to know the status of their case.

23   Q.  Okay.  How about the grade?  Would they be entitled to know

24   what Spar Bernstein thought was the value of the case?

25   A.  I mean, I would -- I would check with our general counsel,

1    but I don't believe so.

2    Q.  Now you had testified that the first time that Plaintiff's

3    Exhibit 24 was put together -- this is the final copy that

4    we're talking about -- was sometime in November, is that

5    correct?

6    A.  Yes.

7    Q.  Okay.  Does November 14, 2014 sound familiar as to date?

8    A.  That was the date the email was sent.

9    Q.  Okay.  And that email was sent to the various parties that

10   needed to have it in order to say, this is your particular

11   case, correct?

12   A.  Yes.

13   Q.  Okay.  And at that time you were the leader of the personal

14   injury department?

15   A.  No.

16   Q.  Okay.  Who was in charge of the personal injury department

17   at that time?

18   A.  I don't know if Adam Handler was still called managing

19   attorney at that point or not.

20   Q.  Okay.  But at that time there were three attorneys in the

21   personal injury department, correct?

22   A.  Right.

23   Q.  Yourself, Adam Handler, and Kimberly Edmonds, right?

24   A.  Right.

25   Q.  And of those three attorneys, who had the most plaintiff PI

 1   experience?

 2   A.   Adam Handler.

 3   Q.   Okay.  And of those three attorneys, who recovered the most

 4   money for clients amongst the three of you?

 5   A.   I don't know how to answer that.

 6   Q.   Okay.  Well, we'll try it like this then:  During the time

 7   that you were at Spar Bernstein in 2014, how much money did you

 8   recover for clients?

 9   A.   I don't know.

10   Q.   You have no idea?

11   A.   No.

12   Q.   Did you settle any cases during 2014 while you were at Spar

13   Bernstein?

14   A.   I think a few.

15   Q.   Okay.  And you have no idea how large or small they were.

16   A.   Wasn't large.

17   Q.   Okay.  Do you know how many cases Mr. Handler settled for

18   Spar Bernstein during 2014?

19   A.   I do not.

20   Q.   Okay.  Do you know how many cases Kimberly Edmonds settled

21   for Spar Bernstein?

22   A.   When?

23   Q.   In 2014.

24   A.   I do not.

25   Q.   Okay.  When did you become the -- I believe the term is

1  group leader?

2  A.  2015.

3  Q.  Okay.  And do you know how much money in 2014 Spar

4  Bernstein recovered for their clients?

5  A.  No.

6  Q.  Did you ever ask anybody at Spar Bernstein how much money

7  they recovered in 2014?

8  A.  Did I ask?  I didn't ask.

9  Q.  Okay.  You're coming in in 2015 and you're taking over this

10 department.  You didn't think that was important to understand

11 what had happened prior to that with respect to the PI

12 department?

13 A.  I do.

14 Q.  Okay.  But you didn't think it was important to figure out

15 how much money Spar Bernstein had recovered in 2014?

16 A.  I know it's millions of dollars, but it doesn't affect how

17 much I'm going to be able to work on the cases that are in

18 front of me now.

19 Q.  If I were to tell you that it was more than $12 million,

20 would that sound about right?

21 A.  Whatever's right is right.

22 Q.  Okay.  And over your whole career as a plaintiff's PI

23 attorney, how much money have you recovered for clients?

24 A.  Millions of dollars.

25 Q.  5 million?

1    A.  I can't put an exact number on it.  I don't know how much

2    money as a firm we made for clients at Robinson & Yablon.  At

3    Gallagher Walker it was saving clients money because we were

4    defending cases.  And Spar Bernstein, again, it's plaintiff's

5    actions, but I've only been there for six, eight months or so.

6    Q.  I understand.  I'm only talking about plaintiff's PI work,

7    okay?

8    A.  Oh, okay.

9    Q.  So while you were at Robinson, wasn't your compensation

10   also contingent upon the value of the case that you settled?

11   A.  No.

12   Q.  You didn't get a year-end bonus that reflected that?

13   A.  I got a bonus, but it was not contingent -- it was not

14   contingent upon the cases I settled.  There was no set formula

15   to that.

16   Q.  Did you ever ask what that was based upon?

17   A.  Discretionary.

18   Q.  Okay.  And at Spar Bernstein is your compensation dependent

19   on the number of cases that you settle, or the value of the

20   cases you settle?

21   A.  Yes.

22   Q.  Okay.  And do you know whether Mr. Handler's compensation

23   while he was at Spar Bernstein was dependent on the amount of

24   cases he had settled, the amount of money he brought into the

25   firm?

1    A.   Generally, yes.

2    Q.   Did you ever speak to Mr. Handler about the number of cases

3    that he had settled?

4    A.   Number?  No.

5    Q.   Did you discuss with Mr. Handler his role as a managing

6    attorney for the department when you started?

7    A.   No.  I kind of just watched him work.

8    Q.   Okay.  And you watched him work because he was a seasoned

9    personal injury attorney, correct?

10   A.   Watched him work because he was an attorney in the

11   department.  Yes.

12   Q.   Did you learn anything from him?

13   A.   How the office functioned.

14   Q.   Did he try more cases than you?

15   A.   Over the course of his career, yes.

16   Q.   And were you able to form an opinion as to Mr. Handler as a

17   plaintiff's personal injury attorney?

18   A.   Yes.

19   Q.   And what is that opinion?

20   A.   Seems to be a competent trial attorney, not very good at

21   legal writing at all, spends the majority of his time

22   negotiating with insurance carriers and delegating as much as

23   possible of everything else.

24   Q.   Okay.  I'd like for you to take a look at what's been

25   marked as Plaintiff's No. 22 for a moment.  You should have it

 1  right there.

 2  A.  Okay.

 3  Q.  If you could look at the first page, which is Bates stamped

 4  SB001435, that's your email that you sent, October 24th, to

 5  Brad Bernstein and others, correct?

 6  A.  Yes.

 7  Q.  And if you go down about -- 1, 2 -- four lines down, it

 8  says, "The matters are graded on a scale of A through C as it

 9  is entirely speculative and in no way reliable to assign active

10  cases a dollar amount."  Do you see that?

11  A.  Yes.

12  Q.  And did you write that?

13  A.  I did.

14  Q.  Okay.  Now you had mentioned that everyone in the PI

15  department received Plaintiff's Exhibit 24 in some type of way,

16  shape, or manner, correct?

17  A.  Everyone in the department?

18  Q.  Well, let me rephrase that.  This document that you

19  referred to as Plaintiff's Exhibit 24, if I recall, you had

20  testified that this document was taken out in various pieces

21  and then given to the various attorneys and/or their

22  paralegals, is that correct?

23  A.  Generally.

24  Q.  Okay.  So effectively what you did is, if a case was

25  assigned to Adam Handler, he didn't need to see the cases that

1   were assigned to Adam Rossol or Kimberly Edmonds, correct?

2   A.   Correct.

3   Q.   And so that what you did was you more or less had the

4   document cut and pasted and the appropriate attorney and/or his

5   or her paralegal got that document, correct?

6   A.   No.

7   Q.   That's not correct?

8   A.   Not that -- not the way you're characterizing it.

9   Q.   Okay.  So how am I mistaken?

10  A.   All of the people on this email got the whole list.

11  Whether you parsed it down for your own focus, that was -- that

12  was what you did.  In other words, to guard the confidentiality

13  and to focus my paralegal's efforts, I only gave her the cases

14  assigned to me.  I don't know if Adam Handler gave his list to

15  his paralegal Derlin.  Kim did give her portion of her list to

16  her paralegal Yvonne, but I didn't divide it up and give

17  everybody a little snippet of it.  That's the difference

18  between what you're saying and what happened.

19  Q.   I apologize if I misstated that.  But would it be accurate

20  to say that this document was meant to stay within the personal

21  injury department?

22  A.   And senior management, David and Brad.

23  Q.   Of course.  And other than Brad Bernstein, who is the owner

24  of the company --

25  A.   Right.

F5j1spa2                    Rossol - Cross

1    Q.   -- or Mr. Lewis, who is in some way or shape or form the

2    general counsel, correct?

3    A.   Yes.

4    Q.   Okay.  Now you had mentioned that a final document was

5    delivered by a Giselle Bobadilla.  Is that how you pronounce

6    her name?

7    A.   Bobadilla.

8    Q.   Okay.  Close enough.  You understand who I'm talking about,

9    correct?

10   A.   I do.

11   Q.   And she was an employee of Spar Bernstein?

12   A.   Yes.

13   Q.   And is she still an employee of Spar Bernstein?

14   A.   Spar Bernstein & Lewis, but yes.

15   Q.   And I'd ask that you turn to what's been marked as

16   Plaintiff's Exhibit No. 25.

17   A.   Okay.

18   Q.   Okay.  Now can you identify that document.

19   A.   It's an email from Giselle to Adam Handler and Derlin.

20   Q.   And does that appear to be Giselle's email address?

21   A.   Yes.

22   Q.   Had you received emails in the past from her?

23   A.   Yes.

24           MR. SCALISE:  Okay.  I'd ask to move in Plaintiff's

25   Exhibit 25.

1    MR. SCHEIMAN:  No objection, your Honor.

2    THE COURT:  All right.  Plaintiff's Exhibit 25 is

3  received.

4    (Plaintiff's Exhibit 25 received in evidence)

5  Q.  Looking down at the bottom, near the bottom of that, after

6  "Regards," it has Giselle Bobadilla's name and then underneath

7  it it says Immigration Client Coordinator, correct?

8  A.  It says that.

9  Q.  Okay.  So you would admit that she's not a member of

10  plaintiff's personal injury department?

11  A.  She's part of firm administration.

12  Q.  Okay.  But she's not senior management, as you testified to

13  earlier.

14  A.  She's a tool of senior management.

15  Q.  Okay.  I'm not sure what that means, but -- when you say

16  tool, but I'll accept that.

17    THE COURT:  Limit the commentary, all right?

18    MR. SCALISE:  Sorry, your Honor.

19  Q.  You had testified, Mr. Rossol, about this confidentiality

20  agreement that you had signed, correct?

21  A.  Yes.

22  Q.  And before you signed it, you had the opportunity to have a

23  discussion with David Lewis about it?

24  A.  I think so.

25  Q.  Yes.  And you had the opportunity to review it before you

F5j1spa2                    Rossol - Cross

1   signed it?

2   A.  Yes.

3   Q.  Okay.  And you had stated that you weren't sure whether the

4   document was always enforced, correct?

5   A.  What?  I don't know.  What are you talking about?

6   Q.  I don't need to know either, but I believe the testimony

7   was that you weren't sure that it was always enforced except

8   maybe in this lawsuit.

9   A.  What?  I don't understand what you're asking me.

10  Q.  Okay.  I'll try to rephrase it.  I believe your testimony

11  was that you were not sure whether the confidentiality

12  agreement has been enforced previously except possibly in this

13  lawsuit.

14  A.  True.

15  Q.  Okay.  Now while you were at Spar Bernstein did you have

16  the opportunity to be aware of various employees being

17  terminated?

18  A.  Did I have the opportunity to be aware of it?  Yes.

19  Q.  Okay.  And one employee that was terminated would be Ava

20  Graham?

21  A.  Yes.

22  Q.  Sandra Taylor?

23  A.  She was terminated.

24  Q.  They worked in the personal injury department, correct?

25  A.  They did.

1   Q.  Was there anybody else around the time that Ms. Taylor was

2   terminated that was also terminated from the personal injury

3   department?

4   A.  She wasn't terminated with Ava, she was terminated with

5   Stephanie Ortiz and Jasmine Beers.

6   Q.  Okay.  And do you know whether or not the firm required any

7   of those terminated employees to search through their files and

8   return any Spar Bernstein information?

9   A.  I have no knowledge.

10  Q.  Incidentally, you had mentioned the medical records were

11  subject to HIPAA, correct?

12  A.  Yes.

13  Q.  As part of the intake process or the process when one

14  starts -- when one becomes a Spar Bernstein client, you receive

15  a HIPAA authorization form, correct?

16  A.  Right.

17  Q.  And you had mentioned that it was valid until a client had

18  withdrawn it, correct?

19  A.  Or the conclusion of the case, but yes.

20  Q.  Or conclusion.  Were you ever aware of a client that has

21  ever withdrawn a HIPAA form?

22  A.  In my career?  Yes.

23  Q.  While at Spar Bernstein.

24  A.  Not at Spar Bernstein.

25  Q.  Okay.  Now going back to the handing out of the cases where

1    the -- in that meeting where Mr. Handler indicated he wanted

2    the better cases, okay, I'd like to talk about that, all right?

3    Were you aware that Mr. Handler's compensation was dependent

4    upon having the better cases?

5    A.  I'm not sure because I -- I was aware it changed, and I

6    didn't know what it changed to.

7    Q.  But you weren't surprised that he wanted the better cases,

8    correct?

9    A.  No.

10   Q.  And from a business perspective, that was probably a

11   prudent move.  He had the most experience, correct?

12   A.  I don't know.

13   Q.  Okay.  Well, let's look at it like this.  When Kimberly

14   Edmonds was working in the firm, how much experience in

15   November did she have, personal injury experience?

16   A.  In terms of years?

17   Q.  Yeah.  We'll start with years.

18   A.  A couple years, three, four years.

19   Q.  Did she have less than you?

20   A.  Yes.

21   Q.  So would it be accurate that Mr. Handler had the most, you

22   then had the next most, and then Kimberly Edmonds was at the

23   bottom, correct?

24   A.  In the aggregate.

25   Q.  Okay.  And would you admit that it would probably not be in

1    the best interests from a business point of view to give

2    Kimberly Edmonds an A case?

3    A.  No, I don't agree with that.

4    Q.  Okay.

5           MR. SCALISE:  Judge, may I just have one moment,

6    please.

7           THE COURT:  Take your time.

8           MR. SCALISE:  Thank you.

9    Q.  Now, Mr. Rossol, when you were at the Robinson firm, you

10   had mentioned that you were involved in some type of

11   underwriting of cases, correct?

12   A.  Yes.

13   Q.  Okay.  And it was a funding company you had mentioned?

14   A.  Yes.

15   Q.  Okay.  And I think when we talked at the deposition, you

16   had referred to it as similar to like a LawCash that is

17   commonly advertised, correct?

18   A.  Right.  A direct competitor of theirs.

19   Q.  A direct competitor.  And when you did this analysis to

20   determine whether or not the case was a good case for the

21   underwriter to fund, you would provide them with a report,

22   correct?

23   A.  Yes.

24   Q.  And that information wasn't confidential to the client, was

25   it?

 1    A.   What?

 2    Q.   The information that you provided wasn't confidential with

 3    an analysis that was done of the case.

 4    A.   To what client?  My client or the funding company?

 5    Q.   Your client was the funding company, correct, but they --

 6    the client came into the funding company and then the funding

 7    company came in and they gave you the facts of the cases and

 8    said, Adam, what do you think of this?

 9    A.   They did that.

10    Q.   Okay.  And you didn't sign any type of confidentiality

11    agreement when you were working for Robinson, the Robinson law

12    firm?

13    A.   I don't believe so.

14    Q.   Okay.  You simply relied on your obligation under the rules

15    of professional conduct, correct?

16    A.   Yes.

17    Q.   Which you understand you must maintain those client

18    confidences, correct?

19    A.   You have to maintain client confidences.

20    Q.   Unless, of course, the client waives that.

21    A.   Yes.

22    Q.   And in order for you to -- for the information to be

23    confidential, to maintain its confidentiality, it actually has

24    to be confidential, correct?

25    A.   Yes.

1          MR. SCALISE:  Okay.  I have nothing further.  Thank

2    you, your Honor.

3          THE COURT:  Redirect, Mr. Scheiman?

4          MR. SCHEIMAN:  Yes, your Honor, briefly.

5    REDIRECT EXAMINATION

6    BY MR. SCHEIMAN:

7    Q.  Would you direct your attention again, Mr. Rossol, to

8    Exhibit 22, please.

9    A.  Okay.  Okay.

10   Q.  Now you were asked on cross about the last sentence in the

11   covering email, is that correct?

12   A.  Yes.

13   Q.  The last part of that sentence says, "to assign active

14   cases a dollar amount," is that right?

15   A.  It does.

16   Q.  And when you were talking about speculation and

17   reliability, were you talking about grading with dollar amounts

18   as opposed to A, B, Cs?

19   A.  Correct.  The dollar amounts would be speculative.

20   Q.  And did you choose to use a grading system other than a

21   dollar amount because that was less speculative and more

22   reliable?

23   A.  Yes.

24   Q.  You were also asked on cross whether or not the firm used

25   the inventory to assess value of cases.  Do you recall that?

1    A.  I do.

2    Q.  And can you tell us whether or not the firm had used this

3    inventory for any other purposes other than just establishing

4    value.

5    A.  Yes.  It was used to allocate resources, including

6    attorneys, to assign the matters to everybody.  It was also

7    used to get a status of what the inventory looked like from

8    a -- what type of negligence cases were there in terms of auto

9    versus premises versus construction, medical malpractice, to

10   see what we had more of, what we had less of, is there anything

11   we could -- is there any area that we should be developing

12   more.  It was being shown what percentage of the cases were in

13   suit versus not in suit, how long cases were taking to move

14   through the pipeline from date of incident up until whatever

15   day you look at the inventory, what sort of things needed to be

16   done on all of the cases, things like that.

17   Q.  It was a management tool?

18   A.  A management tool, yes.

19   Q.  Was it also a risk management tool?

20   A.  Yes.

21   Q.  You were just speaking about working as an underwriter and

22   you were asked certain questions with respect to

23   confidentiality and the funding company.  Who was your client?

24   A.  The funding company.

25   Q.  Did you maintain confidentiality with the funding company?

1   A.   Absolutely.

2   Q.   Did the people who were going to receive funds voluntarily

3   give the funding company the information the company required?

4   A.   Yes, they had to sign a whole host of documents relating to

5   that.

6   Q.   You testified that grade could change when certain events

7   changed.  Do you recall that?

8   A.   I do.

9   Q.   And was that change part of your analytical study of each

10  matter?

11  A.   Yes, on an ongoing basis.

12  Q.   Now we're talking about -- I think we've been talking about

13  an analysis of individual cases.  Is there a difference between

14  an analysis of individual cases and the compendium of all the

15  cases in the law office with all the information that was

16  contained?

17  A.   Yes.

18  Q.   And is that why it's a management tool?

19  A.   Yes.

20  Q.   Is that why it's a risk management tool?

21  A.   Yes.  The client's not entitled to know the health of the

22  whole inventory.

23  Q.   But management did.

24  A.   Correct.

25  Q.   You said that you weren't sure whether or not Ms. Graham or

1     Ms. Taylor were asked to return any documents, is that right?

2     A.   Right.

3     Q.   And you don't know one way or another, do you?

4     A.   No.  I wasn't present for their terminations.

5     Q.   And you weren't present for any exit interviews.

6     A.   Not at all.

7     Q.   Does the confidentiality agreement require returning

8     materials?

9     A.   It does.

10             MR. SCHEIMAN:  I think I have no further questions,

11    Mr. Rossol.  Thank you very much.  No further questions.

12             THE COURT:  Anything further, Mr. Scalise?

13             MR. SCALISE:  One or two questions, your Honor.

14    RECROSS EXAMINATION

15    BY MR. SCALISE:

16    Q.   Would you admit that this grading system that you developed

17    might have very little use to somebody who has tried hundreds

18    of cases in the personal injury department?

19    A.   No.

20    Q.   You don't believe so?

21    A.   No.

22    Q.   You believe your analysis is the analysis that controls

23    with respect to these cases?

24    A.   I didn't say it controls.

25    Q.   Okay.  Well --

1    A.  I said it would be of use.

2    Q.  It would be of use.  To somebody who has more personal

3    injury experience than you?

4    A.  Yeah.

5    Q.  It would be of use to them.

6    A.  Yes.

7    Q.  Even though you've acknowledged that your analysis

8    sometimes may not be accurate.

9    A.  I didn't say that.

10   Q.  Well, you said in the analysis, the value of the case may

11   not be an accurate valuation of the case.

12   A.  I don't understand.

13   Q.  Okay.  Well, your grading system, you had mentioned that it

14   was speculative.

15   A.  I didn't say that, at all.

16   Q.  Okay.  The document will speak for itself.

17           One last question.  Do you believe that this is a

18   trade secret?

19   A.  Yes.

20           MR. SCALISE:  Thank you.

21           MR. SCHEIMAN:  No further questions, your Honor.

22           THE COURT:  All right.  I have a couple of questions

23   for you, Mr. Rossol.

24           First, whose idea was it to prepare this personal

25   injury inventory document?

1              THE WITNESS:  David Lewis.

2              THE COURT:  And did Mr. Lewis offer you the columns

3      that he wanted of information that he wanted contained on this?

4              THE WITNESS:  Some of it.  He wanted to make sure that

5      I included certain pieces of information, but I designed all

6      the columns overall.

7              THE COURT:  All right.  In your prior experience at

8      the Robinson firm did you have any document similar to the

9      personal injury inventory here?

10             THE WITNESS:  Actually, no, your Honor.

11             THE COURT:  How did you keep track of your cases at

12     the Robinson firm?

13             THE WITNESS:  Joel Robinson kept track of the cases.

14     It was a smaller firm.  And it was literally a Word document.

15     There was like two or three Word documents.  One of them was a

16     list of clients; that's it.  Another one was a list of cases in

17     suit.  Oh, there was a list of clients, but it had statute of

18     limitations on it so you made sure you didn't blow that, so to

19     speak.  The second one was whether cases were in suit or not.

20     And then the third one was the note of issue as cases that were

21     on the trial calendar that needed to either be resolved or

22     subpoenaed and done trial prep and all that sort of stuff.

23     Those were the three lists.  But there was no analysis in those

24     lists.

25             THE COURT:  So when you were putting this list

F5j1spa2          Rossol

1    together, why didn't you include statute of limitations and

2    note of issue?

3              THE WITNESS:  The -- the statute of limitations is

4    diaried on the case management software of the firm and so

5    relative to whether or not the case has been sued, you would

6    get reminders that were preset as to when that was coming up.

7    So they have that for the note of issue information.  Which

8    also changed, as well as different court orders.  But that was

9    put on that system.

10             THE COURT:  How often is this personal injury

11   inventory updated?

12             THE WITNESS:  As cases -- new cases come in, I would

13   say it's added to weekly.

14             THE COURT:  And who does that?

15             THE WITNESS:  Me.

16             THE COURT:  In preparing the inventory, did anyone

17   work with you on it?

18             THE WITNESS:  Other than identifying cases that were

19   not on it, no.

20             THE COURT:  Did you sit and discuss with any of the

21   other attorneys in the personal injury department various cases

22   that you were putting on the -- on this inventory?

23             THE WITNESS:  Yeah, a little bit, yes.

24             THE COURT:  I mean, that would make sense, wouldn't

25   it?  They know the cases.  You were brand new to the firm,

1    right?

2            THE WITNESS:  Okay.

3            THE COURT:  So did you discuss with Mr. Handler

4    various cases that appear on the inventory?

5            THE WITNESS:  Yes.

6            THE COURT:  And talk to him about his assessment?

7            THE WITNESS:  I don't recall talking to him about his

8    assessment specifically, your Honor, whether he thought it was

9    a good or bad case or anything of that nature.

10           THE COURT:  That wouldn't be something you would ask

11   the attorney who was working on the case in the firm?

12           THE WITNESS:  Well, the firm was structured

13   differently before this.  There wasn't one attorney on one

14   case.  It was kind of Adam Handler worked on all the cases and

15   everyone kind of served as his helper, so they were

16   theoretically all of his cases.  That changed after the

17   document was created.  That was part of why it was created, I

18   believe, your Honor.

19           THE COURT:  Did you understand at the time that you

20   were hired and came into the firm that there was going to be a

21   change in the way that the personal injury practice was

22   handled --

23           THE WITNESS:  Yes, your Honor.

24           THE COURT:  -- at the firm?

25           THE WITNESS:  Yes.

1          THE COURT:  Tell me what you understood was going to

2     be changed when you came into the firm.

3          THE WITNESS:  As opposed to everybody helping the

4     managing attorney, everyone -- all the attorneys were going to

5     be assigned their own caseload and their own paralegal, and the

6     word that David Lewis used was that he was trying to build a

7     meritocracy so that every -- every attorney/paralegal team

8     could be evaluated on the -- the success of the work of their

9     particular caseload and not just anecdotally based upon how

10     much credit they were given for helping the managing attorney

11     in general.

12          THE COURT:  All right.  I think earlier, in response

13     to a question that Mr. Scheiman asked you on redirect, you said

14     that one of the purposes of this list was for the allocation of

15     resources within the firm.

16          THE WITNESS:  Yes.

17          THE COURT:  Do you recall that?

18          THE WITNESS:  I do.

19          THE COURT:  How is it you're to allocate resources?

20          THE WITNESS:  Well, with respect -- I mean, the

21     attorneys are resources themselves, so you were allocating

22     manpower to cases to make sure that not any one person had too

23     much to handle.  That's one thing that comes to mind when I say

24     that.  Same thing with paralegals.  You wanted to make sure

25     that the staffing levels were appropriate.

1      THE COURT:  Earlier you said that it was used to

2  divide up the cases to make sure that nobody had too many

3  cases.  And I take it from that that you were endeavoring to

4  ensure, in this meritocracy, that each attorney/paralegal unit

5  had roughly the equivalent number of cases.  1is that roughly

6  what was at play.

7      THE WITNESS:  Generally.  If somebody had complicated

8  stuff, that counted more than simpler cases, but generally that

9  is true, your Honor.

10      THE COURT:  How would you figure out from this list

11  what case was more complicated than another?

12      THE WITNESS:  For example, automobile accidents that

13  are rear-ends, pretty straightforward, fairly basic.  If it's a

14  construction case with all sorts of labor law and insurance

15  coverage issues on top of insurance coverage issues, a lot of

16  experts involved, that could be very complicated.  So that

17  could be -- I guess if the injuries are severe, that is a more

18  valuable case.  If the coverage is big, it is a more valuable

19  case.  From a legal perspective, that could be a lot of legal

20  work.  It could be like 10-car accident cases, that kind of

21  thing, or complicated med mal or something like that.

22      THE COURT:  I have no further questions.  If either

23  counsel wishes to follow up on the Court's inquiry --

24      MR. KAUFMAN:  No, your Honor.  Thank you.

25      MR. SCALISE:  No, your Honor.  Thank you.

F5j4spa3

1          THE COURT:  Mr. Rossol, you're excused.

2          (Witness excused)

3          THE COURT:  We will take a five-minute recess, and

4  then the plaintiff will call its next witness.

5          (Recess)

6          THE COURT:  Call your next witness.

7          MR. KAUFMAN:  Yes, your Honor.  We call the defendant,

8  Adam Handler.

9   ADAM HANDLER,

10       called as a witness by the Plaintiff,

11       having been duly sworn, testified as follows:

12          THE DEPUTY CLERK:  Please state your full name and

13  spell your last name for the court reporter.

14          THE WITNESS:  Adam Shane Handler, H-A-N-D-L-E-R.

15          THE COURT:  You may inquire, Mr. Kaufman.

16  DIRECT EXAMINATION

17  BY MR. KAUFMAN:

18  Q    Good afternoon, Mr. Handler.

19  A    Hi, Mr. Kaufman.

20  Q    You're licensed to practice law in the state of New York?

21  A    Yes.

22  Q    How long have you been licensed?

23  A    Since 2004.

24  Q    You were employed as an associate at the Spar & Bernstein

25  firm starting sometime in 2005; is that right?

1    A    Yes.

2    Q    Your employment was terminated on January 21, 2015?

3    A    Yes, I was fired.

4    Q    At some point, you received the Spar & Bernstein employee

5    handbook during your employment; isn't that correct?

6    A    I did.

7    Q    There is no question you signed the acknowledgment to that

8    handbook; is that correct?

9    A    I believe I did, yes.

10   Q    You signed the acknowledgement, agreeing to the terms in

11   the Spar & Bernstein employee handbook; is that correct?

12   A    I signed the handbook, yes.

13   Q    You read the acknowledgment before you signed?

14   A    My custom and practice is to read before I sign.  I can't

15   specifically recall, but I will say that is my custom and

16   practice.

17   Q    When you signed, you intended to comply with the terms of

18   that employee handbook; is that correct?

19   A    Yes.

20   Q    The handbook did contain a requirement at page 26 that you

21   read -- strike that -- there was a requirement, on page 26, of

22   confidentiality that you had read before you signed the

23   acknowledgment; correct?

24   A    I don't recall that.

25   Q    You don't recall that?

1   A   I don't remember the entire handbook, especially page 26.

2   Q   You received a confidentiality agreement from David Lewis

3   that you were requested to sign; is that right?

4   A   I did.

5   Q   If you could turn to the book that has the exhibits in it.

6   A   Okay.  Which exhibit?

7   Q   The first volume, and turn to 27.

8           Is that the employee handbook?

9   A   It says employee handbook.

10  Q   Is that the one that you acknowledged when you signed it?

11  A   I can't say specifically, but it does say employee

12  handbook, 2010-2011.

13  Q   If you turn to exhibit 28, that's the acknowledgement that

14  you signed; right?

15  A   Yes.

16  Q   That is your signature?

17  A   I recognize my signature but nobody else's.

18          MR. KAUFMAN:  Your Honor, I would offer to admit

19  Exhibit 28.

20          MR. SCALISE:  No objection.

21          THE COURT:  Plaintiff's Exhibit 28 is received in

22  evidence.

23          (Plaintiff's Exhibit 28 received)

24          MR. KAUFMAN:  I believe I understood your Honor that

25  Exhibit 27 was already admitted.

1       THE COURT:  It is.

2       MR. KAUFMAN:  Thank you.

3  BY MR. KAUFMAN:

4  Q   With respect to the confidentiality agreement that

5  Mr. Lewis provided you, you signed that agreement; is that

6  correct?

7  A   I believe I did, yes.

8  Q   You signed intending to agree to its terms?

9  A   Yes.

10 Q   If you could turn, please, to Exhibit 30 in your book.  Is

11 that the confidentiality agreement that you signed?

12 A   Yes.

13 Q   If you turn to the second page of Exhibit 30, is that your

14 signature?

15 A   Yes, sir.

16 Q   Signed July 28, 2013?

17 A   Yes.

18 Q   You read this document before you signed; correct?

19 A   As I testified earlier, I believe I read through it.  I

20 don't know if every word, but I definitely read through it

21 before I signed it.

22 Q   If you read through it before you signed it, you saw the

23 second-to-the-last paragraph before the Spar & Bernstein

24 acknowledgement and agreement regarding confidentiality that

25 you see on the second page?

1    A    I do see that.

2    Q    That is the section that deals with upon termination of

3    employment with the firm; is that correct?

4    A    Yes.

5    Q    So when you read this document before you signed, you

6    understood what requirements existed upon termination; correct?

7    A    I never thought I would be fired, so I didn't really think

8    about how it would apply to me, but I read that it is requested

9    of the employees, yes.

10            MR. KAUFMAN:  Your Honor, I would offer to admit

11   Exhibit 30.

12            MR. SCALISE:  No objection.

13            THE COURT:  Exhibit 30 is received.

14            (Plaintiff's Exhibit 30 received)

15   BY MR. KAUFMAN:

16   Q    During the course of your employment at Spar & Bernstein,

17   you were provided by the law firm certain electronic devices

18   that you could use in your law practice; isn't that correct?

19   A    Yes.

20   Q    Spar & Bernstein provided you a desktop computer?

21   A    Yes.

22   Q    Spar & Bernstein provided you with a laptop; is that

23   correct?

24   A    Yes.

25   Q    You used that laptop largely at home; is that correct?

1    A    Yes.

2    Q    You were provided a Blackberry at one time?

3    A    I was.

4    Q    You traded that in for a firm iPhone?

5    A    Upon fierce contesting, yes.

6    Q    The firm also provided you an iPad given to you as a gift?

7    A    It was a Christmas bonus.

8    Q    At home, you also had a home computer, personal computer;

9    is that right?

10   A    Yes.

11   Q    You also had a personal iPhone you had, as well, in

12   addition to your firm iPhone?

13   A    Yes.

14   Q    Putting the Blackberry aside that had been replaced by the

15   firm iPhone, these are all devices, electronic devices, both at

16   home and at work, provided by the firm that you had use of

17   around November of 2014, going forward to when you were

18   terminated?

19   A    But for my personal iPhone.  The firm did not supply that.

20   Q    I'm sorry?

21   A    But for my personal iPhone, yes, those things were supplied

22   either for work-related purposes or as a Christmas bonus.  Yes.

23   Q    From November 14 forward, you also had a personal iPhone

24   that you used; correct?

25   A    Yes.

 1    Q    You continued to use your home computer, as well?

 2    A    Yes.

 3    Q    You had a number of personal email addresses that you used;

 4    correct?

 5    A    Yes.

 6    Q    One of your email addresses that was personal was

 7    ahandlerlawyer@gmail.com; is that correct?

 8    A    Yes.

 9    Q    And you used that email address up through approximately

10    February of 2015; correct?

11    A    Yes.

12    Q    You also used an email that was provided by the law firm at

13    Spar & Bernstein, that was ahandler@lawsbl.com?

14    A    Yes.

15    Q    And you used that as your firm email?

16    A    Yes.

17    Q    You also had another personal email address, which was

18    terp2law@aol.com; is that correct?

19    A    Yes.

20    Q    You would use that going way back to college; is that

21    right?

22    A    Right after I graduated college, yes.

23    Q    During the time that you were employed at Spar & Bernstein,

24    you used both of your personal email accounts that we have just

25    identified; is that correct?

F5j4spa3                    Handler - direct

1    A    Yes.

2    Q    And you used those personal email accounts to review Spar &

3    Bernstein emails from time to time; correct?

4    A    No.

5    Q    Didn't you use those two email accounts to forward yourself

6    Spar & Bernstein emails that you could then review on that

7    email account?

8    A    Yes, on occasion, I did that, yes.

9    Q    So Spar & Bernstein emails would be forwarded by you to one

10   or the other of your personal email accounts from time to time?

11   A    Yes.

12   Q    So is it fair to say that over time your two personal email

13   accounts were used to hold certain Spar & Bernstein client and

14   firm information that you had forwarded by email?

15   A    I wouldn't say used to hold.  I would use it to access at

16   the time and then move on to the next project for the firm, but

17   I wouldn't say I was holding it in any sense.

18   Q    Well, the email accounts contained Spar & Bernstein emails

19   that you had forwarded, and they continued to contain them

20   after you forwarded them; correct?

21   A    I would agree with that, yes.

22   Q    That is what I was suggesting was meant by hold.  Is that a

23   fair characterization?

24   A    No, I thought you meant, like, save it for a later date or

25   something.  But yes, they were contained in there.

 1   Q    Now, after you left Spar & Bernstein, you set up a new

 2   personal email account that was adamhandleresq@gmail.com; is

 3   that right?

 4   A    Yes.

 5   Q    You started using that roughly in February of 2014?

 6   A    Yes.

 7   Q    However, after you left Spar & Bernstein, you continued to

 8   have access to your two personal email accounts, the

 9   terp2law@aol.com. and ahandlerlawyer@gmail.com accounts;

10   correct?

11   A    Yes.

12   Q    You had access to view emails on those two accounts when

13   you were at home; correct?

14   A    Yes.

15   Q    You had access to view the content of those email accounts

16   that were personal email accounts at your law practice;

17   correct?

18   A    Yes.

19   Q    You could continue to view them at your law practice after

20   you left Spar & Bernstein; correct?

21   A    Yes.

22   Q    You are now at a firm that is known as Pollack, Pollack,

23   Isaac & DeCicco; is that right?

24   A    Yes.

25   Q    When I refer to having access to your Gmail accounts at

1    your current law practice, it is at the Pollack firm; correct?

2    A    Sure.

3    Q    Now, with respect to your computer at home, I think you

4    testified that you occasionally used to do work at home related

5    to your Spar & Bernstein employment?

6    A    Yes.

7    Q    And, therefore, you would store on your home computer,

8    through your email account, certain information that was Spar &

9    Bernstein or Spar & Bernstein client information that you would

10   use to do work at home; correct?

11   A    It was on my email but not saved on my hard drive of the

12   computer.  Yes, accessible by email, absolutely.

13   Q    Do recall forwarding yourself, from time to time, client

14   information by email that you could view at home on your

15   personal Gmail account; correct?

16   A    In the course of my duties for the firm, absolutely.

17   Q    Now, you also had Spar & Bernstein work and client-related

18   information contained on your personal iPhone since November of

19   2014; is that correct?

20   A    Yes.

21   Q    After you were terminated on January 21, 2015, you kept the

22   firm laptop for about a week and a half at home before you

23   returned it; correct?

24   A    I was in Florida, but when I came back, I returned it.

25   Q    You had access to that laptop before you returned it,

1    correct, and after your termination?

2    A    Yes.  Yes.

3    Q    So you already talked about the two iPhones you had after

4    November of 2014.  Prior to your termination on January 21,

5    2015, you had synched the contacts and photo dimensions of your

6    firm iPhone with your personal iPhone so that photos and

7    contact information would be transferred to your personal

8    iPhone; correct?

9    A    Correct.

10   Q    In fact, you say you installed apps on both phones to allow

11   that transfer to occur?

12   A    The people at Best Buy told me, to get my baby's pictures

13   off of the work cell phone and onto my personal cell phone, I

14   would need to download an app, and you press a button, and the

15   pictures of my family would be on my personal phone.

16   Q    In fact, after you created that synchronization, transfers

17   of data from your firm iPhone to your personal iPhone in the

18   form of photographs and contacts occurred periodically?

19   A    Whenever I would -- yeah, whenever I would want to move

20   photos from one to the other, it would.

21   Q    And there were Spar & Bernstein-related and client-related

22   materials that then were transferred to your personal iPhone;

23   correct?

24   A    Yes.

25   Q    Those Spar & Bernstein and client-related materials that

1    were transferred to your personal iPhone simply sat in the

2    email on the iPhone; correct?

3    A    I don't understand your question.

4    Q    Didn't the transferred material from your firm iPhone to

5    your personal iPhone simply sit in your email?

6    A    No.  I didn't transfer emails.  I just transferred

7    photographs.

8    Q    Did you transfer files from your firm iPhone to your

9    personal iPhone?

10   A    Photographs.

11   Q    Did you also transfer files?

12   A    No.

13   Q    Client materials?

14   A    No.

15   Q    You recall giving a deposition in this case?

16   A    Yes.

17   Q    And you had the oath administered like we did here in

18   court?

19   A    Yes.

20              MR. KAUFMAN:  If I may approach, your Honor.

21              THE COURT:  You may.

22   Q    Do you have volume 1 in front of you?

23   A    This is May 14th at 9:45?

24   Q    Yes.  That was the first session of your deposition; is

25   that correct?

1    A    I believe so, yes.

2    Q    Would you turn to page 73, please.  I would like to direct

3    your attention to line 1.  Okay?

4    A    Yes.

5    Q    I'm going to ask you if you recall these questions and

6    these answers.  First, line 1:

7    "Q    Did you store any client-related or client files on your

8    firm iPhone?

9    "A    Did I keep Spar & Bernstein materials on my Spar &

10   Bernstein iPhone?

11   "Q    Yes.

12   "A    Yeah, of course, I did.

13   Q    Line 10:

14   "Q    Did you keep any Spar & Bernstein-related materials or

15   client files from Spar & Bernstein clients on your personal

16   iPhone?

17   "A    Not intentionally, but yeah, it was on there.

18   "Q    During what period of time?  November 14 forward?

19   "A    I would say so."

20   Q    Was that your testimony then under oath?

21   A    Yes.

22   Q    Is that your truthful testimony today?

23   A    Yes.

24   Q    From time to time, you also forwarded client material to

25   what is called the Dropbox account; is that right?

1    A    Yes.

2    Q    What is the Dropbox account?

3    A    My understanding, it is this cloud-based portal where you

4    can drag information from one computer and then be able to

5    access it on another computer other device.

6    Q    During what period of time did you use that technique?

7    A    I don't know.  I don't.

8    Q    But you used that from time to time in your law practice?

9    A    I would use it when I was on trial, yes.

10   Q    And you would be able to access information that you had

11   dragged into a file and put on the Dropbox through using your

12   iPad; is that correct?

13   A    Yes.  I could display it to the jury.

14   Q    The Dropbox material that you forwarded from time to time

15   was Spar & Bernstein or client-related materials at Spar &

16   Bernstein; is that correct?

17   A    Yes.

18   Q    Where are those materials today?  Still on your Dropbox?

19   A    I don't know.  I haven't accessed my Dropbox since before

20   my termination.

21   Q    Have you accessed the Dropbox that you used to send any

22   Spar & Bernstein materials or client-related materials in

23   connection with this lawsuit to return materials that were

24   there?

25   A    No.

1   Q    You don't know what is there, and you, therefore, don't

2   know what is there to possibly return?

3   A    Correct.

4   Q    Did you do any search in connection with document

5   production in this case of the contents of your Dropbox?

6   A    No.

7   Q    Do you still have access to the Dropbox we talked about?

8   A    I don't remember my log-in and password but I could click a

9   button and, I am sure, gain access to it.

10  Q    Your employment was terminated on January 21, 2015, as

11  you've testified.  Did you leave hard files of materials behind

12  that day when you left your office?

13  A    Yes.

14  Q    But you were asked to return your firm iPhone at that time;

15  correct?

16  A    Correct.

17  Q    You did return it; correct?

18  A    Yes.

19  Q    You returned your Spar & Bernstein firm laptop that you

20  kept at home after you returned from vacation; correct?

21  A    Yes.

22  Q    The day that you left Spar & Bernstein, you had client and

23  firm-related material contained in your two personal email

24  accounts; correct?

25  A    Yes.

F5j4spa3                    Handler - direct

1    Q   And this material is still housed in those two personal

2    email accounts; correct?

3    A   Yes.

4    Q   You haven't deleted any of it?

5    A   I have not.

6    Q   Ever, since you left the firm --

7    A   I don't believe I have, no.

8    Q   Now, once you were at the Pollack firm, as you testified,

9    you were able to access your Gmail accounts through your

10   desktop, there was a date there that you were at your desk and

11   you opened up, on your Pollack computer to your

12   ahandlerlawyer@gmail.com account; is that right?

13   A   Yes.

14   Q   At that time that account started populating with thousands

15   of Spar & Bernstein emails on the Spar & Bernstein email

16   account that you had used; is that right?

17   A   Yes.  Yes.

18   Q   And you believed that those emails were populating on your

19   ahandlerlawyer@gmail.com account on that day and merging into

20   your account that you were using at the Pollack firm, the

21   personal email account?

22   A   Yes.

23   Q   You're aware that your lawyer, Mr. Scalise, advised general

24   counsel of Spar & Bernstein that he estimated that there were

25   over 40,000 Spar & Bernstein emails that had populated on your

1   ahandlerlawyer@gmail.com account that day?

2   A   I'm aware of that because I told him that.

3   Q   You told him it was 40,000?

4   A   I said approximately, yes.  I was very upset.

5   Q   This occurred on February 6th of 2015?

6   A   I don't recall the exact date.

7   Q   Didn't you answer your interrogatories by providing the

8   February 6, 2015 date for that event?

9   A   I would have to see the interrogatory, but when I was

10  answering it, I referred to a document.

11  Q   When you answered it, you referred to a document?

12  A   Yes.

13          MR. KAUFMAN:  Your Honor, may I approach with the

14  answers to interrogatories?

15          THE COURT:  Of course.  You need not ask permission.

16  Q   If you turn to the last page of the answers to

17  interrogatories, Mr. Handler -- the second-to-last page --

18  excuse me -- that's the verification you signed; is that right?

19  A   Yes, sir.

20  Q   If you could please turn to the answer to interrogatory

21  number 10.  And the question reads:  "Identify when you learned

22  of the alleged email migration referenced in paragraphs 57 and

23  59 of S&B's complaint in this action and the steps, if any, you

24  took to preserve and protect S&B's trade secrets and

25  confidential information transferred to your email account via

1    the alleged email migration, including, but not limited to, an

2    identification of any information technology person or

3    consultant you used to evaluate such email migration."

4              Below that is the series of objections.

5              And then about the fourth line from the bottom of the

6    answer, it says, "Notwithstanding and without waiving said

7    objection, defendant learned of the alleged email migration on

8    February 6, 2015, at which time he ceased using the account."

9              Do you see that?

10   A    Yes, I do.

11   Q    Does that refresh your recollection that you had verified

12   that that is the date of this email migration?

13   A    Yes.

14   Q    You're saying you stopped using the

15   ahandlerlawyer@gmail.com account from that day forward?

16   A    Yes.

17   Q    You still maintain access to it today on your Pollack

18   computer?

19   A    Yes.

20   Q    You can go in there and do anything you want with that

21   account?

22   A    Yes.

23   Q    Look at those; correct?

24   A    Yes.

25   Q    The emails that were populating, some 40,000 of them, on

1   that date were emails that had either been sent to you or by

2   you when you were at Spar & Bernstein; correct?

3   A    Yes.

4   Q    These related to firm matters?

5   A    Yes.

6   Q    They related to client matters?

7   A    Yes.

8   Q    Some of them included client communications?

9   A    Yes.

10  Q    Some of them included work product?

11  A    Yes.

12  Q    Some of them included privileged information?

13  A    Yes.

14  Q    From time to time, you used your firm iPhone to take

15  photographs; correct?

16  A    Yes.

17  Q    You did that for work-related purposes; correct?

18  A    Yes.

19  Q    Sometimes you would take photographs of client injuries?

20  A    Yes.

21  Q    In one case, you went to the hospital and took a photograph

22  of somebody you were looking to possibly represent?

23  A    Yes.

24  Q    You would take those photographs, and those photographs

25  from time to time were then transferred to your personal

1    iPhone; correct?

2    A    Technically speaking, yes.

3    Q    You know -- and you have seen examples of this the other

4    day -- that there are photographs that were transferred to your

5    personal iPhone that were client photographs showing certain

6    client injuries; correct?

7    A    Yes.

8    Q    Those still sit on your personal iPhone; correct?

9    A    I would assume so, but I would have to check.

10   Q    You haven't checked?

11   A    No.

12   Q    Have you examined your personal iPhone to look for any

13   Spar & Bernstein-related client materials that were transferred

14   from your firm iPhone to your personal iPhone in order to

15   return them to Spar & Bernstein?

16   A    Yes.  Yes.

17   Q    Have you returned anything to Spar & Bernstein?

18   A    Other than what has been provided in discovery, no.

19   Q    From time to time, you would use your firm iPhone to take a

20   photograph of a document; correct?

21   A    Yes.

22   Q    You could use the photo feature of your firm iPhone to

23   photograph a document?

24   A    Yes.

25   Q    And in the past when you were at Spar & Bernstein, you

 1   actually used that feature to photograph medical records of

 2   clients of Spar & Bernstein?

 3   A    Yes.

 4   Q    You then forwarded, from time to time, those medical

 5   records to your personal iPhone account; correct?

 6   A    No.

 7   Q    Didn't you see an example the other day of a medical record

 8   that was photographed and then transferred to the personal

 9   iPhone?

10   A    The document you showed me the other day, we don't know if

11   it came from the personal iPhone.

12   Q    Firm iPhone.  Did you transfer that photograph to your

13   personal iPhone, those photographs of documents?

14   A    If the photograph existed in my firm iPhone when I

15   transferred my photographs of my children, my grandmother, and

16   everybody else, yes, that would be transferred, as well.  There

17   is no way to segregate what's transferred and what's not.

18   Q    The reason is that if you have an array of photographs in

19   your firm iPhone, which include personal photographs and

20   photographs of medical records, they all get transferred

21   together; correct?

22   A    Yes.

23   Q    In other words, if your firm iPhone contains photographs of

24   medical records, photographs of clients showing their injuries,

25   photographs of HIPAA authorizations, those would all, as part

1    of a transfer of the entire file be transferred to your

2    personal iPhone?

3    A    Yes.

4    Q    Have you searched the records of your personal iPhone at

5    home to segregate out and return to Spar & Bernstein any

6    materials in the form of photographs of either people or

7    documents that are client-related and no longer client

8    materials for clients that you're working for?

9    A    Have I segregated them out?

10   Q    Have you looked for and segregated out any photographs of

11   people or documents that don't relate to any personal matter

12   you have or any client that you're currently representing or

13   one that you formerly represented at Spar & Bernstein?

14   A    I have looked for.  I have not segregated out.

15   Q    There are, in fact, some materials for former clients of

16   Spar & Bernstein that are still in the photographs portion of

17   your personal iPhone?

18   A    I would assume so, yes.

19   Q    Let me ask you to look at the second book of exhibits.  I'm

20   going to ask you to turn to exhibit 57, which is a large single

21   exhibit that has subparts.  The subparts are labeled A, B, C,

22   and so forth.

23          These are all, I will represent to the Court and the

24   witness, documents that were produced by the defendant in the

25   document production in this case.

1      They came from, Mr. Handler, your personal email

2  account; is that right?

3  A    Yes.

4  Q    So you searched your personal email account and located

5  these documents and produced them in the case?

6  A    Yes.

7  Q    These are largely documents that relate to clients that you

8  have not represented since you left Spar & Bernstein; is that

9  right?

10 A    I don't know how you characterize "largely."  I would have

11 to go through each one.  If you would like me to do that, I

12 can.

13 Q    Let's do that.

14 A    Start at A and go --

15 Q    Let's take 57A.  Do you represent the client shown in

16 Exhibit 57A?

17 A    No.

18 Q    Haven't represented that client since you left?

19 A    Since I was fired, no.

20 Q    57B, have you represented that client since you left Spar &

21 Bernstein?

22 A    Since I have been fired, no.

23 Q    And 57A, how would you characterize that document?

24 A    This is the intake sheet that we would do when a call came

25 in.

 1    Q    Some of this contains medical information?

 2    A    Yes.

 3    Q    How would you characterize 57B?

 4    A    Same thing.

 5    Q    Intake sheet?

 6    A    Yes.

 7    Q    Represents some medical information?

 8    A    Yes.

 9    Q    Would you please tell me if you currently represent, since

10    you left Spar & Bernstein, the client represented in 57C?

11    A    I have not represented Mr. Karan since I have been fired.

12    Q    57C is an intake sheet and also has medical information in

13    it; is that right?

14    A    Yes.

15    Q    Would you tell me if you represented the client listed in

16    57D since you left Spar & Bernstein?

17    A    Since I have been fired, no.

18    Q    Does that also include some medical information?

19    A    Yeah, it has pain in the waist, sure.

20    Q    Would you please turn to Exhibit 57E and tell me, please,

21    what's the nature of that documentation.

22    A    Well, you can go by the last part of it.  This is an email

23    from one of my associates telling me that we're going to sign

24    up a client.

25    Q    Is this a client you've represented since you left Spar &

1    Bernstein?

2    A   Since I have been fired, no.

3    Q   Does that contain, in that documentation, some medical

4    information?

5    A   Yes.

6    Q   Would you please look at Exhibit 57F and tell me if you

7    have represented that client since you have left Spar &

8    Bernstein?

9    A   Since I have been fired, no.

10   Q   Is that a client that you've represented since that point

11   in time?

12   A   I just said no.

13   Q   Thank you.  I apologize.

14          Please turn to Exhibit 57G.  Would you describe the

15   nature of that documentation?

16   A   This is an email from one of my paralegals, advising me

17   that one of the people that called to have my help was going to

18   call me and sign with the firm.

19   Q   Was that a client that you've represented since you left

20   Spar & Bernstein?

21   A   Since I have been fired, no.

22   Q   I'm going to use the term "left" only because I'm trying to

23   get a point in time.

24          THE COURT:  I understand, and I understand why

25   Mr. Handler is repeatedly responding that he was fired

1    because --

2                MR. KAUFMAN:  I will use another word maybe --

3                THE COURT:  But it is not necessary.  I've got the

4    point.  We don't have to go through these.

5                My only question is:  Essentially these were what,

6    emailed to you by various people who were working with you at

7    the time in the firm, showing a client intake sheet with all

8    this information?

9                THE WITNESS:  Correct.  These are emails from my

10   staff, telling me something that is going on with respect to a

11   potential case.

12               THE COURT:  I got it.

13   Q   These sit on your personal email, and you have access to

14   them today?

15   A   Technically speaking, I have access.  Do I access them?

16   No.

17   Q   You have not made any effort to download all of this

18   material onto a disk and return it to Spar & Bernstein;

19   correct?

20   A   I don't even know how to do that, no.

21   Q   You haven't asked a forensic person how to do that?

22   A   I have not.

23               MR. KAUFMAN:  Your Honor, I will avoid going through

24   the rest of the subparts, but I'm going to indicate to the

25   Court that I will be doing the same type of examination on each

F5j4spa3                    Handler - direct

1   document to establish that these are essentially not clients he

2   represents anymore but he retains the material and possession

3   of it.

4           THE COURT:  All right.  It is not necessary.  One or

5   two are sufficient exemplar.  Indeed, some of these have to be

6   redacted because they have social security numbers in them.  I

7   wouldn't receive them in evidence with a social security

8   number.

9           MR. KAUFMAN:  Subject to redacting those limited

10  materials out, I offer this exhibit, 57 and all the subparts,

11  unless I can have a stipulation.

12          THE COURT:  It is duplicative.  It is not necessary.

13          MR. KAUFMAN:  I think, your Honor, the point we're

14  making here is the scope and substantiality of the material

15  that is confidential and privileged that this gentleman has

16  that he has not returned, and that's the point I'm making.

17          THE COURT:  You've made the point.  I've got it.

18  Quite frankly, I've got a question for Mr. Handler and his

19  attorney.

20          Why isn't this either put on a disk and returned, or

21  why doesn't Mr. Handler invite counsel for the plaintiff to his

22  office where they can hit the "delete" button?

23          MR. SCALISE:  Judge, I will address both of those.  We

24  would love to delete everything here.  We had a legal hold that

25  came into being at some point, so we were concerned.  We don't

1    want this information.  We don't need this information.  We're

2    more than happy to do that.  There was an issue about

3    Mr. Handler going through, as this Court is well aware, close

4    to 20,000, now even 40,000 emails, and trying to look to see

5    what is relevant.  He is more than happy right now to delete

6    everything.  He doesn't need any of this information.  These

7    are not clients he deals with.  We are more than happy to

8    stipulate to that, Judge.

9              MR. KAUFMAN:  This is what we've been trying to get

10   done for months.

11             THE COURT:  I have six lawyers in the courtroom here.

12   This is absurd.

13             MR. SCALISE:  If counsel would agree that the fact if

14   we delete everything, there is no spoliation claim or anything

15   along those lines, we're happy to do it, Judge.  We don't need

16   it.

17             MR. KAUFMAN:  What we have been proposing -- and I

18   won't bore you with how long -- is let's preserve it by moving

19   it onto a disk and then let's delete it at the original source.

20   Case closed.  If we move the material back to Spar & Bernstein,

21   we delete it in his possession, we have solved the problem

22   under our agreement as to that material.  That's what we've

23   been trying to do here for some time.

24             MR. SCALISE:  We're happy to do that.  It wasn't

25   proposed like that.  We're happy to do that, Judge.

1          THE COURT:  I don't --

2          MR. SCALISE:  We're happy to do that, Judge.

3          THE COURT:  I don't want to hear that.

4          MR. SCALISE:  Understand.

5          THE COURT:  I tend to generally presume that all

6     lawyers and parties before me are acting in commercially

7     reasonable manners, and you're testing that presumption by

8     suggesting that it's never been proposed, that you would be

9     happy to do this.  Take it up when we conclude today, but for

10    now, why don't we move on to something else.

11         MR. KAUFMAN:  Be happy to.  Can you give me a minute

12    to regroup?

13         THE COURT:  Sure.

14         You've offered 57A --

15         MR. KAUFMAN:  I went as far as G, I believe, or H.

16         THE COURT:  You have offered 57A through G.  Any

17    objection to receiving 57A through G?

18         MR. SCALISE:  No, your Honor.

19         THE COURT:  Because E has a social security number

20    that I saw, and you better check to make sure that that kind of

21    personal identifying information isn't in the exhibit that I

22    just received.

23         MR. KAUFMAN:  We will do that, your Honor.

24         THE COURT:  All right.

25         MR. KAUFMAN:  Thank you.

1              (Plaintiff's Exhibits 57 A through G received)

2    BY MR. KAUFMAN:

3    Q    Mr. Handler, you were, at one point in time, asked to

4    create a personal injury inventory spreadsheet; is that

5    correct?

6    A    Yes.

7    Q    While you were at Spar & Bernstein, you were asked to do

8    that work?

9    A    Yes.

10   Q    You recall that what you were being told to create within

11   this document was to include a client name?

12   A    Yes.

13   Q    A date of accident?

14   A    Yes.

15   Q    The injury?

16   A    Yes.

17   Q    The insurance company?

18   A    Yes.

19   Q    The statute of limitations date?

20   A    Yes.

21             THE COURT:  Could you establish a time, when was

22   this --

23             MR. KAUFMAN:  Yes.

24   BY MR. KAUFMAN:

25   Q    This was roughly in May of 2014; is that correct?

1    A    I believe so, yeah.

2    Q    You, yourself, never completed that project; correct?

3    A    By myself, no, I did not.

4    Q    But you worked on the project in some capacity between

5    May and October of 2014; is that right?

6    A    Yes.

7    Q    Ultimately, Adam Rossol was asked to complete the project

8    you had started; correct?

9    A    Yes.

10   Q    You were assigned this project by David Lewis; is that

11   right?

12   A    And Brad Bernstein.

13   Q    When that project was assigned to you, you wrote to

14   Mr. Lewis this is a, quote/unquote, huge project?

15   A    I remember seeing that email the other day, yes.

16   Q    If you could turn to your first exhibit book and turn to

17   Exhibit 13.

18         Mr. Handler, this is an email string; is that correct?

19   A    You have very interesting ways of describing things, but if

20   you want to call it a string, I will adopt that as a string.

21   Q    There are a couple of emails on this document?

22   A    It is a string.

23   Q    The first email at the bottom of the first page is from

24   David Lewis to you, with the copies as shown, dated May 2,

25   2014; is that right?

1    A    I'm sorry.  On the top?

2    Q    Bottom.

3    A    Oh, bottom.

4              Yes.

5    Q    That email to you from David Lewis asks you if we can

6    create an updated spreadsheet of all cases in the personal

7    injury department ASAP; correct?

8    A    Yes.

9    Q    You responded to him; correct?

10    A    Yes.

11    Q    That's the email at the top of that page?

12    A    Yes.

13    Q    Your words were:  This is a huge project.  Let me figure

14    out logistically how we can get it done.  What's your deadline?

15              Is that right?

16    A    Yes.

17    Q    You were concerned about how much would have to be done and

18    how quickly it would have to be done to complete the project

19    you were assigned?

20    A    In light of me managing 300 cases on my own, yes.

21    Q    There were approximately 300 personal injury cases at the

22    Spar & Bernstein firm around that time; correct?

23    A    I would estimate about that, yes.

24    Q    There was a point in time soon after this Exhibit 13 that

25    you identified what you considered to be a wish list that you

1    had to work on that project; is that right?

2    A    Yes.  David Lewis and Brad Bernstein sat myself and the

3    other attorneys down and said, specifically give us a must-have

4    list and give us a wish list of what you wish the new firm

5    software would contain.

6            MR. KAUFMAN:  Before I forget, your Honor, may I offer

7    to admit Exhibit 13?

8            MR. SCALISE:  No objection.

9            THE COURT:  Plaintiff's Exhibit 13 is received.

10           (Plaintiff's Exhibit 13 received)

11           MR. KAUFMAN:  Thank you.

12   BY MR. KAUFMAN:

13   Q    If you could turn your attention to Exhibit 14,

14   Mr. Handler.

15   A    I'm sorry.  Not must-haves.  Deal breakers.

16   Q    Exhibit 14 is an email from you to David Lewis, Lennie

17   Strat, and Brad Bernstein, dated May 5, 2014; is that right?

18   A    Yes.

19   Q    At the bottom of this email, you write you have what is

20   called a wish list; is that correct?

21   A    Those are the terms that Mr. Bernstein and Mr. Lewis asked

22   us to use, wish list.

23   Q    And you have item number 2, a listing that says:  Case list

24   that allows us to track case values.  We can use insurance

25   policy limits as the measuring stick.

1     Do you see that?

2   A    Yes.

3   Q    That was your idea?

4   A    It was my idea and I believe Brad's idea, as well.  We

5   wanted to know what is in the inventory to satisfy the

6   financial needs of the firm, yes.

7   Q    Your idea at that time was using insurance policy limits as

8   a measuring stick for case value; is that right?

9   A    That is one part of it, yes, absolutely.

10  Q    The insurance company coverage amounts, these are amounts

11  that each file in the personal injury department for each

12  client would have shown somewhere in the file; correct?

13  A    Yes.  Yeah.

14  Q    You would have to go into the file, look for it, and pull

15  it out to know what it is?

16  A    No.  Or I would enter that information into the case

17  management software.

18  Q    When the case was opened?

19  A    Yes.

20  Q    You would have to look into the software to retrieve that

21  information instead of the file; right?

22  A    It would come from one of three sources:  One, in the case

23  management software; two, it would be in the physical file; or

24  three, we would make a phone call to the insurance company and

25  say, how much coverage do you have for this particular claim.

1    Q   You would do one of those things to get the information to

2    put onto this inventory; correct?

3    A   Either I would do it or have a paralegal do that.  Anybody

4    could make that call.

5    Q   You didn't know that information off the top of your head

6    for 300 cases; correct?

7    A   Actually, I knew pretty much a range of all of those, yes.

8    If you were to tell me a particular case, I would be pretty

9    close to knowing what the coverage is.

10   Q   You wanted to be certain, that's why the work was done to

11   put precise amounts onto this inventory?

12   A   Of course.

13   Q   The case value in a given situation is not necessarily the

14   insurance limits; correct?

15   A   No.  Case values, I believe, are unreliable and

16   speculative, but they do change as the case goes on and the

17   progress of the medical treatment, absolutely.  It does move up

18   and down.

19   Q   Case value would be ascertained by looking at a number of

20   indicia or factors or information; correct?

21   A   Yes.

22   Q   Some of the information that you look at to establish a

23   value would be who the insurance carrier is; correct?

24   A   Yes.

25   Q   Some insurance carriers pay more than others; correct?

1   A    Some insurance carriers pay more to me than they pay

2   others, yes.

3   Q    You would also look at the relationship that you or your

4   firm had to the defense attorney; correct?

5   A    Absolutely.

6   Q    You would look at the relationship that you or the other

7   attorney's office had to the insurance carrier?

8   A    Sure.

9   Q    The injuries in the case have to be assessed by both the

10  doctor and the lawyer to determine the significance of the

11  injury to the value of the case; correct?

12  A    Yes.  Also in speaking to the client.

13  Q    So, going back to May of 2014, you started to draft this

14  case list by what you characterized first as cutting and

15  pasting; correct?

16  A    Yes.  I believe I had my paralegal start obtaining

17  information and sending it to me, and I was slowly but surely

18  cutting and pasting to the document, yes.

19           MR. KAUFMAN:  Let me offer to admit Plaintiff's

20  Exhibit 14.

21           MR. SCALISE:  No objection.

22           THE COURT:  Plaintiff's Exhibit 14 is received.

23           (Plaintiff's Exhibit 14 received)

24  Q    Mr. Handler, could you turn your attention to Plaintiff's

25  Exhibit 15, please.

1    A    Yes.

2    Q    At this point in time, in June of 2014, you had started to

3    draft the case list, as you've characterized it; correct?

4    A    Started to, yes.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. KAUFMAN:

2    Q.  And that was your term, "case list," correct?

3    A.  I'm sorry.  What?

4    Q.  You chose the term "case list."

5    A.  Sure.

6    Q.  Now if you look at the document attached to -- strike that.

7            The email at the top of page 1 of Exhibit 15 is an

8    email from you to Brad Bernstein, David Lewis, and Lennie

9    Strat, is that right?

10   A.  Yes.

11   Q.  And here you're saying that this is the most recent version

12   of the case list per Ava, correct?

13   A.  Yes.

14   Q.  Ava's the paralegal?

15   A.  No.

16   Q.  Who was Ava at that time?

17   A.  Ava was -- we called her at that time an intake specialist.

18   Q.  Okay.  And was she the one that was putting this document

19   together for you?

20   A.  She was assisting me, yes.

21   Q.  Okay.  So this is the latest version of that case list at

22   that point in time.

23   A.  I suppose so.

24   Q.  And that's what's attached to it?

25   A.  Yes.

1    Q.  Now if you look at that document that's attached, those at

2    that time you believe represented all the personal injury cases

3    at Spar Bernstein?

4    A.  I can't say for sure now, but my email says that there are

5    some cases that are being settled or signed up, so I would say

6    this represents a large majority of our cases.

7    Q.  Now this list at this point in time has client matter

8    number of the firm, is that right?

9    A.  It does.

10   Q.  It has the name of the client?

11   A.  It does.

12   Q.  It indicates whether it's in suit or not?

13   A.  It does.

14   Q.  And what is the last date?

15   A.  I believe that is a date of injury.

16   Q.  All the information you compiled at that point in time?

17   A.  At that point, yes.

18            MR. KAUFMAN:  Your Honor, I would offer to admit

19   Exhibit 15.

20            MR. SCALISE:  No objection.

21            THE COURT:  All right.  Plaintiff's Exhibit 15 is

22   received in evidence.

23            (Plaintiff's Exhibit 15 received in evidence)

24   Q.  Mr. Handler, if you could please turn to Plaintiff's

25   Exhibit 17.  The first page starts at the top with an email

1    dated June 20th of 2014 from you to David Lewis, Brad

2    Bernstein, and Lennie Strat, but the remainder of the document

3    is a series of prior emails, is that correct?

4    A.  It's a string of emails.

5    Q.  Okay.  And these were all emails that you had on your email

6    account?

7    A.  Yes.

8    Q.  This was at your Spar Bernstein email account, correct?

9    A.  Yes.

10   Q.  Now if you turn to the second page, the top of the second

11   page there's an email from David Lewis to Brad Bernstein, you,

12   and Lennie Strat dated June 17th of 2014, is that right?

13   A.  The one that says SOL and date of accident is a must?

14   Q.  Yes.  Mr. Lewis is talking about the statute of limitations

15   and date of accident is a must put on the document, correct?

16   A.  Yes.

17   Q.  And then at the top of the first page of that exhibit, your

18   email, you say, "We're working our way through the list again,"

19   is that right?

20   A.  Yes.

21   Q.  Meaning you were continuing to do the work to add more

22   information?

23   A.  I was doing my best to get it done, yes.

24   Q.  And you say that this is a sample format, meaning the

25   format that had just been reviewed by everybody?

1  A.  No.  This is the format that I kind of envisioned the case

2  list being in, so I was sending it to him to determine whether

3  or not that would be acceptable.

4  Q.  The format below this has categories of information that

5  you had determined would be in the case list at that point.

6  A.  I felt this would be adequate, yes.

7          MR. KAUFMAN:  Your Honor, I would offer to admit

8  Exhibit 17 at this time.

9          MR. SCALISE:  No objection.

10          THE COURT:  Plaintiff's Exhibit 17 is received.

11          (Plaintiff's Exhibit 17 received in evidence)

12  Q.  Now when you in that exhibit used the word "we" to say that

13  "we are working to get it" or "we have to go through the

14  physical file," the "we" you're referring to is the staff

15  that's working on it, is that right?

16  A.  Myself and my staff, yes, we.

17  Q.  And the staff at that time included Ava, is that correct?

18  A.  I believe so.

19  Q.  Included Sandra?

20  A.  Yes.

21  Q.  Included Stephanie?

22  A.  Yes.

23  Q.  What is Stephanie's last name?

24  A.  Ortiz.

25  Q.  And Sandra?

1    A.   Taylor.

2    Q.   And Ava?

3    A.   Graham.

4    Q.   Very good.  And you're not sure if Crystal was working at

5    that time, is that right?

6    A.   I wasn't -- I'm not sure if she had quit yet.

7    Q.   And you're not sure if Jasmine was working at that time?

8    A.   Correct.

9    Q.   You're not sure that Corey was working at that time.

10   A.   I don't remember if he was part of the PI team at that

11   time.

12   Q.   Okay.  So without knowing that, it's possible that your

13   staff was larger than the three plus you that you remember that

14   was working on this project?

15   A.   No, I believe on June 20th we were short-staffed.

16   Q.   And the staff work was to go into each file or the case

17   management software or to make phone calls to gather the

18   information, correct?

19   A.   Yes, I said to them, go through the file, move the data

20   from one place into another.

21   Q.   The idea was to assemble all this information to a single

22   place on a single document for each of the client files in the

23   office, correct?

24   A.   That was the goal.

25   Q.   The goal, therefore, was to create that tool for the firm,

1    correct?

2    A.   Yes.

3    Q.   Now around this time in June of 2014 Mr. Bernstein had

4    requested that additional information be added, correct?

5    A.   I don't remember.  Mr. Bernstein's email was before I

6    sent -- his email of June 17th, in response, I sent this.

7    Q.   Okay.  So in other words, he had made some suggestions on

8    categories to add, correct?

9    A.   Sure.

10   Q.   And that's what you had gone ahead and done.

11   A.   Yeah.

12   Q.   Now you also suggested around this point in time that Adam

13   Rossol, who hadn't started working at Spar Bernstein yet,

14   should also be consulted for his opinion on cases, is that

15   right?

16   A.   I don't remember when I sent that email, but you did show

17   it to me the other day and I did suggest that he would be

18   helpful.  I believed that he would be helpful, absolutely.

19   Q.   You didn't think it would hurt to have his opinion at all,

20   is that right?

21   A.   No, of course not.

22   Q.   You thought it would be helpful to get the views of another

23   personal injury lawyer when you were assessing those matters,

24   correct?

25   A.   Yes.

1   Q.  Now as of August of 2014, the PI inventory project was

2   still not completed, is that right?

3   A.  Yes, correct.

4   Q.  Adam Rossol was ultimately asked to complete that project,

5   is that right?

6   A.  Yes.

7   Q.  And he ultimately did complete that project, is that

8   correct?

9   A.  Yes, he did.

10  Q.  And you believe that Mr. Rossol circulated the PI inventory

11  document draft to you, is that right?

12  A.  Yes.

13  Q.  Okay.  You're quite definite that you received the draft of

14  that inventory, correct?

15  A.  I believe so, yes.

16  Q.  And you recall getting that document by email on the Spar

17  Bernstein email, correct?

18  A.  Correct.

19  Q.  And you had access to that document through the Spar

20  Bernstein email, is that right?

21  A.  Correct.

22  Q.  But you also had access from time to time to the PI

23  inventory through your own gmail account, didn't you?

24  A.  Incorrect.

25  Q.  Well, if you forwarded it to your personal gmail, you had

1    access to it, correct?

2    A.  If I forwarded it, yes.

3    Q.  You had a practice of forwarding documents to your personal

4    gmail, correct?

5    A.  I did have a practice, yes.  With respect to the case list

6    I can't say, but with respect to other matters, absolutely.

7    Q.  So today -- strike that.

8          But you also recall coming into possession of the hard

9    copy of the PI inventory spreadsheet, is that right?

10   A.  Yes.

11   Q.  And you simply cannot recall whether Mr. Rossol personally

12   delivered it to you or you got that hard copy some other way?

13   A.  Either he gave it to me or printed it out.

14   Q.  And you had specifically requested that Mr. Rossol provide

15   you interim drafts as he was working on this project, correct?

16   A.  Yes.

17   Q.  Now if you look at Exhibit 21 --

18         MR. KAUFMAN:  I believe this has been already

19   admitted, your Honor, is that right?  I believe it has.

20   Q.  If you look at Exhibit 21, Mr. Handler, this is from Adam

21   Rossol to you dated October 15, 2014, and the email to you

22   says, "Per your request, see attached."  And attached is a

23   current working draft of the PI inventory, is that right?

24   A.  Yes.

25   Q.  Had you requested that he send you that draft?

1    A.  Yes.

2    Q.  And you asked for that draft so that you could review the

3    draft, is that right?

4    A.  Yes.

5    Q.  So that you could propose changes that you felt might be

6    appropriate?

7    A.  And to help in any other way, absolutely.

8    Q.  You would also want to look at the draft to see if you had

9    a difference of opinion as to the value of the matters,

10   correct?

11   A.  Yes.

12   Q.  And you wanted to look at these interim drafts so that you

13   wouldn't have to look at one massive document at the very end,

14   correct?

15   A.  I figured it would be easier to go as we went along,

16   absolutely.

17   Q.  Did you take your time to go through the draft then for the

18   purposes you've enunciated?

19   A.  I believe I took my time, yeah.

20   Q.  You wanted to make sure you were providing quality input,

21   correct?

22   A.  Yes.

23   Q.  You looked at each case and looked at the information and

24   decided whether to propose any additive changes, correct?

25   A.  Yeah.  I felt nobody knew the cases better than me, yeah.

1    Q.  Now there was a meeting where the management of the firm,

2    Mr. Lewis and Mr. Bernstein, together with the personal injury

3    lawyers that worked at Spar Bernstein, met to review the PI

4    inventory spreadsheet in order to allocate the cases and assign

5    the cases among the lawyers, correct?

6    A.  Yes.

7    Q.  Do you remember that meeting?

8    A.  I do.

9    Q.  Where was that meeting held?

10   A.  In the conference room.  We had pizza.

11   Q.  Now if you could take a look, please, at what's been marked

12   as Exhibit 24.  This is an email from Adam Rossol to Giselle

13   Bobadilla with copies to Mr. Bernstein, Lewis, Strat, you, and

14   Kimberly Edmonds, is that right?

15   A.  Yes.

16   Q.  And this is the document that was circulated that had

17   divided up the matters among the lawyers that had been decided

18   at that meeting?

19   A.  I believe so.

20   Q.  And you see on the second line of Mr. Rossol's email that

21   the document's sorted by attorney and then by case quality

22   grade, A through C, correct?

23   A.  I do see that.

24   Q.  So you understood that the A, B, or C was referring to case

25   quality analyses that had been completed up to that point in

1  time.

2  A.  Yes.

3  Q.  And in the email Mr. Rossol tells you towards the bottom

4  that, "I wanted to get you the assigned list now so you can get

5  started."  Do you see that?

6  A.  Yes.

7  Q.  That's get started in the handling of the matters assigned?

8  A.  Yeah, to make sure that you have the files and the

9  information you need 'cause now it's your responsibility.

10  Q.  And you had your own team that worked on the matters that

11  you were assigned, correct?

12  A.  Yeah, I had a paralegal.

13  Q.  Paralegal assisted you.

14  A.  Yes.

15  Q.  And you had a hard copy in front of you of the PI inventory

16  document during that meeting, correct?

17  A.  Yeah.

18  Q.  There was grade information contained on Exhibit 24

19  regarding each of the matters, correct?

20  A.  When you say great, you mean like really cool or great

21  meaning a lot?

22  Q.  G-R-A-D-E, grade.

23  A.  Oh, grade.  I'm sorry.  Yes, there was a grade.

24  Q.  And that's the last column of the document?

25  A.  Yes.

1    Q.   So when you refer to case quality, that's one of the

2    indicators of case quality that was contained on this document?

3    A.   Sure.

4    Q.   And that case quality grade was a way of establishing the

5    relative chance of success on the matter, is that correct?

6    A.   Hmm.  I guess that's the way Adam Rossol thought of it.

7    Q.   Did you think of it that way?

8    A.   No.

9    Q.   Did you testify to that the other day?

10   A.   I mean, we had a general consensus that we would say A is

11   the better case and C is the weaker case, but everything's

12   subject to change.

13   Q.   I'd like you to turn your attention to your deposition

14   transcript.

15   A.   Which day, Volume I or Volume II?

16   Q.   First volume, please.

17   A.   Okay.  One second.  I'm just trying to find it.

18   Q.   Okay.  If you turn your attention to page 232, there's a

19   question on line 12.  Do you recall this question:

20   "Q.   And it also had a grade.  Do you see that?

21   "A.   Yes.

22   "Q.   And the grade is designed to reflect what the firm

23   estimated the value of the case was, A being more valuable than

24   C, is that right?

25   "A.   No, not necessarily.

1   "Q.  Well, what was A, B, and C?

2   "A.  Well, again, Adam and I discussed that the rankings are in

3   no way reliable and were speculative, but we ranked them on how

4   we felt on, you know, chance of success.  Put it that way."

5          Do you see that?

6   A.  Sure.

7   Q.  So you did believe that the grade reflected --

8          THE COURT:  The answer continued for another two

9   lines.

10  Q.  "Now that success could mean winning $10,000 or

11  $10 million, that's correct."

12  A.  And that's what I meant, yeah.

13  Q.  Plus the chance of success had a lot to do with the

14  strength of the case, the underlying liability, correct?

15  A.  Sure.  As Mr. Rossol testified, you're hit in the rear, you

16  got a good chance.  You got a guy making a left turn at an

17  intersection, maybe not so much.

18  Q.  So you were trying to establish chance of success, not a

19  dollar value per se when you did these grades, correct?

20  A.  I can't remember.  I just remember knowing that

21  Mr. Bernstein said, we need money, tell us our best cases, and

22  we'll divide it up.  I don't remember -- I just don't remember.

23  Q.  No, I'm not asking that question, sir.  I'm asking you,

24  when you were establishing these grades, you were establishing

25  the quality of the case from the perspective of the chance of

1  success, not trying to set a dollar figure.

2  A.  We tried to determine the better cases from the not better

3  cases.

4  Q.  From the perspective of chance of success, meaning winning

5  a result, whatever that amount would be, correct?

6  A.  No.  I would say general consensus of winning but also

7  making money on it.  I would say those two things -- chance of

8  success and how much we could win.  I think that's a fair way

9  to say it.

10 Q.  The evaluation of all the things you looked at involved

11 subjective judgment by the lawyers making the evaluation,

12 correct?

13 A.  Absolutely.

14 Q.  And those judgments were what were considered as part of

15 establishing these grades.

16 A.  Sure.  One person can say a case is worth -- is a good

17 case, another person can say that's a terrible case.

18 Q.  But you were collectively -- you and Mr. Rossol --

19 collaborating on establishing a common judgment as to what the

20 chance of success or the quality of the case was, A, B, or C,

21 for each of the matters in the office, correct?

22 A.  I believe we collaborated, yes.

23 Q.  You collaborated to arrive at that judgment, correct?

24 A.  Sure.

25 Q.  You agreed on that judgment.  There were no dissenting

1    opinions listed on the chart, is that right?

2    A.  Well, I don't know if Mr. Rossol made a column for dissent,

3    but we definitely had disagreements, but we resolved it in a

4    way of saying, let's change it.  I remember having a few

5    laughs, actually, we'll change it from an A to a B, B to an A.

6    Q.  The factors that you considered as part of making the

7    collective judgment on the quality of the case included the

8    kind of case it was?

9    A.  Yes.

10   Q.  It included the value of the insurance coverage?

11   A.  Yes.

12   Q.  It included the extent of the injury?

13   A.  Yes.

14   Q.  Potential for future surgery?

15   A.  Yes.

16   Q.  It included whether or not a particular venue would apply?

17   A.  Yes.

18   Q.  Now if we look at back to the exhibit book, Exhibits 21,

19   24, and 27, I'm going to ask you a question about all three of

20   those.

21   A.  21 --

22   Q.  24, and 27.

23   A.  Okay.

24   Q.  Excuse me.  21, 24, and 25.  I apologize.

25   A.  Okay.

1    Q.  Each of these is a version of the PI inventory spreadsheet,

2    is that correct?

3    A.  Yes.

4    Q.  21 being dated on October 15th of 2014, 24 being attached

5    to the November 12, 2014 email, is that correct?

6    A.  Yes.

7    Q.  And 25 being attached to a November 17 -- or being referred

8    to in a November 17th email, is that correct?

9    A.  Yes.

10   Q.  You had access to all of those documents on your firm

11   laptop through use of your firm email, correct?

12   A.  No.

13   Q.  Didn't you have an email version of that that had been

14   e-mailed to you?

15   A.  I did not have my firm email on my firm laptop.

16   Q.  Okay.  Let me go back.  You had a firm desktop.  I

17   apologize.

18   A.  Yes.

19   Q.  And you had access to those three documents on your firm

20   desktop through your firm email account.

21   A.  Yes.

22   Q.  All right.  I apologize.

23          So at the time of January 21, 2015, you were aware of

24   the values that had been set for each of those matters as

25   reflected on those PI inventory spreadsheets, correct?

1   A.  Generally aware, yes.  I don't recall every case and the

2   grade we gave, but --

3   Q.  When you left the firm, or were terminated by the firm, you

4   knew that some of the matters that you worked on at the firm

5   had A grades, correct?

6   A.  Yes.

7   Q.  You just can't remember a hundred percent of them, correct?

8   A.  Correct.

9   Q.  Now you say that you looked for the personal injury

10  inventory document in your gmail account after you left, or

11  were terminated by the firm?

12  A.  I did.

13  Q.  But you didn't run a word search that you can recall for

14  personal injury inventory, did you?

15  A.  No.  I ran a word search -- no, no, I did not.

16  Q.  Therefore none were produced in this case, correct?

17  A.  There's no case list produced, correct.

18  Q.  Now after you were -- strike that.

19          Following January 21, 2015, you went right to the

20  airport to leave for vacation, is that right?

21  A.  I was fired 20 minutes before I was scheduled to leave the

22  office, yes.

23  Q.  And you started calling clients that you had represented at

24  Spar Bernstein from the airport, is that right?

25  A.  I was.  I did.

1  Q.  And the reason you were able to do that is you had access

2  to the client names and phone numbers on your personal iPhone,

3  correct?

4  A.  I had some of their names, yes.

5  Q.  The contacts had been transferred to your personal iPhone

6  from the firm.

7  A.  Along with my grandmother and my snowplow removal guy, but

8  yes.

9  Q.  We're not worrying about them today.  I'm asking about the

10  clients.

11  A.  Yes, all my contacts were transferred over, yes.

12  Q.  Now as of the last session of your deposition, which was

13  yesterday morning, you had told us that you had no records that

14  you had created for the phone calls that you made to contact

15  Spar Bernstein clients you represented, is that correct?

16  A.  I did say that yesterday, but then I realized I misspoke.

17  Q.  Well, we've had document production going on in this case

18  for a while and none has been produced in this case until we

19  got a letter about an hour and a half before we came to court,

20  is that right?

21  A.  That is correct.

22  Q.  And you testified that you made a list in your head in

23  order to make those phone calls starting when you were at the

24  airport, is that correct?

25  A.  Correct.

1    Q.  Now you indicated yesterday that there were approximately

2    37 Spar Bernstein clients that you'd represented that you

3    remember calling during a short period of time after your

4    termination, is that correct?

5    A.  I don't remember the number, but we went over a whole bunch

6    yesterday, yes.

7    Q.  There were a significant number of those clients that you

8    called that had A grades on the PI inventory, isn't that true?

9    A.  Turns out they did, yes.

10   Q.  And you believe you subsequently had personal meetings

11   after phone calls to these clients that you'd represented at

12   Spar Bernstein, is that correct?

13   A.  Yes.

14   Q.  And those were personal meetings that preceded their

15   signing transfer paperwork and engagements of you to represent

16   them, correct?

17   A.  Yes.

18   Q.  And during those meetings that you had with them before

19   they engaged you, you discussed their cases with them, correct?

20   A.  Yes.

21   Q.  So it's fair to say, Mr. Handler, that not all the contacts

22   that you had with the Spar Bernstein clients that you sought to

23   represent were contacts you had by telephone, is that right?

24   A.  That is correct.

25   Q.  Can you explain why you answered the interrogatory

1    indicating that all of the contacts were by phone.

2    A.  I don't understand.  I'm sorry.  Maybe I just misunderstood

3    the last question.

4    Q.  Could you please turn your attention to the answers to

5    interrogatories.

6    A.  Oh, yes.

7    Q.  And if you could turn your attention to the answer to

8    interrogatory no. 4.

9            Actually, this may make it a little bit easier.

10   Interrogatories 2 and 3 are asking about details about contacts

11   that you had in soliciting Spar Bernstein clients after you

12   were terminated by the firm, correct?

13   A.  Well, I wouldn't use the word "soliciting," but calling

14   them, yes.

15   Q.  Calling them.  I didn't mean that as pejorative.  You were

16   calling them to see if they wanted you to represent them.

17   A.  No.  They wanted me to continue to represent them.

18   Q.  Now interrogatory no. 4 is asking for documents in your

19   possession that support your answers to 2 and 3, is that right?

20   A.  Yes.

21   Q.  And in answer to interrogatory no. 4, you say in the last

22   sentence, "Furthermore, all contact with the aforementioned

23   clients was over the telephone."  Now obviously that's not

24   true.

25   A.  Yeah, I called the clients and then we met, so yeah, of

F5j1spa4           Handler - Direct

1   course we met in person.

2   Q.  So the contacts were not all by telephone; they were a

3   mixture of phone calls and meetings.

4   A.  I will agree with you, yes, sir.  I misunderstood the

5   question.

6   Q.  Now you characterized these phone calls that you made

7   before you had meetings later as initial contacts with these

8   Spar Bernstein clients, is that right?

9   A.  I don't remember saying initial contacts, but I -- I called

10  clients, yes.

11  Q.  You don't remember using the term "initial contacts" in

12  your interrogatory answers?

13  A.  To save time, I'll adapt -- I'll adapt "initial contacts."

14  Q.  Well --

15  A.  It's all good.

16  Q.  Please turn your attention to answer to interrogatory

17  no. 2.  This interrogatory asks, "Identify each current or

18  former client of S&B whom you contacted either before or after

19  your termination from S&B in connection with soliciting that

20  client to retain the legal services of you, the law office of

21  Adam S. Handler, and/or Pollack, Pollack, Isaac & DeCicco, LLP,

22  and/or to terminate the legal services of S&B, and for each

23  such client identify when you contacted that client, the method

24  you used to contact that client, including but not limited to

25  whether the contact was via phone, email, text message, letter,

SOUTHERN DISTRICT REPORTERS, P.C.      (212) 805-0300

1    other communication, or personal meeting, and the content of

2    each such contact or communication with the client."  And then

3    in answer, after the objection, in the middle of the answer to

4    interrogatory no. 2, it says, "Notwithstanding and without

5    waiving said objection, initial contact took place generally

6    within a two-week period after being terminated by plaintiff

7    was by telephone and in sum and substance," and then you went

8    on to describe the conversation.  Those were your words,

9    correct?

10   A.  Yeah, generally, I called them on my cellphone, yes.

11   Q.  Initial contacts.

12   A.  Yeah, generally.

13   Q.  In your deposition you said you never used that term, is

14   that correct?

15   A.  I don't remember what I said.

16   Q.  We'll get back to that.  When we take a short break, I'll

17   find it.  But we'll get back to that.

18             MR. KAUFMAN:  May I have one moment, your Honor?

19             THE COURT:  Yes.  Off the record.

20             (Discussion off the record)

21             THE COURT:  Mr. Handler, you can step down.  We're

22   going to recess until tomorrow morning at 10:00.  My calendar

23   is clear tomorrow, so if I feel we're falling behind, we'll

24   take an abbreviated lunch, all right?  You can leave whatever

25   materials you'd like to leave here overnight.  The courtroom

1   will be locked.  All right?

2           ALL COUNSEL:  Thank you, Judge.

3           THE COURT:  Have a good evening.

4           ALL COUNSEL:  Thank you.  You too, your Honor.

5           THE DEPUTY CLERK:  All rise.

6           (Adjourned to May 20, 2015, at 10:00 a.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3    ADAM ROSSOL

4    Direct By Mr. Scheiman . . . . . . . . . . . .13

5    Cross By Mr. Scalise . . . . . . . . . . . . .47

6    Redirect By Mr. Scheiman . . . . . . . . . . .75

7    Recross By Mr. Scalise . . . . . . . . . . . .78

8    ADAM HANDLER

9    Direct By Mr. Kaufman . . . . . . . . . . . .85

10                   PLAINTIFF EXHIBITS

11   Exhibit No.                          Received

12     6  . . . . . . . . . . . . . . . . . . . .19

13     7  . . . . . . . . . . . . . . . . . . . .20

14     8  . . . . . . . . . . . . . . . . . . . .21

15     9 through 12  . . . . . . . . . . . . . . .21

16    21  . . . . . . . . . . . . . . . . . . . .29

17    22  . . . . . . . . . . . . . . . . . . . .34

18    23  . . . . . . . . . . . . . . . . . . . .35

19    24  . . . . . . . . . . . . . . . . . . . .38

20    29  . . . . . . . . . . . . . . . . . . . .43

21    25  . . . . . . . . . . . . . . . . . . . .69

22    28  . . . . . . . . . . . . . . . . . . . .87

23    30  . . . . . . . . . . . . . . . . . . . .89

24    57 A through G . . . . . . . . . . . . . . 114

25    13  . . . . . . . . . . . . . . . . . . . 117

14 . . . . . . . . . . . . . . . . . . . 120

15 . . . . . . . . . . . . . . . . . . . 123

17 . . . . . . . . . . . . . . . . . . . 125